2014 COA 129

The **PEOPLE** of the State of Colorado,
Plaintiff–Appellee,

v.

**Juan Antonio MORALES,**
Defendant–Appellant.

**Court of Appeals No. 11CA1132**

Colorado Court of Appeals,
Div. IV.

Announced October 9, 2014

John W. Suthers, Attorney General, Ethan E. Zweig, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee

Douglas K. Wilson, Colorado State Public Defender, Andrew C. Heher, Deputy State Public Defender, Denver, Colorado, for Defendant–Appellant

Opinion by JUDGE NAVARRO

¶ 1 Defendant, Juan Antonio Morales, appeals the judgment of conviction and sentence entered on jury verdicts finding him guilty of one count each of felony sexual assault, attempted felony sexual assault, and misdemeanor sexual assault. Because we conclude that his conviction and sentence for attempted felony sexual assault violate double jeopardy principles, we vacate that conviction and sentence. Otherwise, we affirm.

## I. Background

¶ 2 The evidence presented at trial showed that, on the night of the charged assault, the victim, sixteen-year-old B.R., attended a party at the apartment of an acquaintance, A.R. The young people at the party, including B.R., spent the evening drinking alcohol and smoking marijuana, and became intoxicated. After a few hours, B.R. fell asleep in a bedroom. Eventually, three other girls also fell asleep in the same bedroom.

¶ 3 Morales is A.R.'s step-father. He was present for some of the party but did not interact much with the other partygoers. B.R. testified that, before sunrise the next morning, she was awakened by the sensation of Morales kissing her on her face, lips, neck, chest, and stomach. Her shirt had been pulled up, and her pants had been pulled down partially. B.R. felt Morales place his penis on and around the opening of her vagina but not inside of it. Morales also performed cunnilingus on her. Within three or four minutes, B.R. pushed him off of her.

¶ 4 Someone turned on the lights in the room when B.R. began screaming at Morales and alleging that he had tried to rape her. A.R. came into the room and escorted an apparently intoxicated Morales out of the apartment. B.R.'s mother called the police later that day when B.R. told her what had happened.

¶ 5 Morales was charged with two counts of sexual assault under section 18–3–402, C.R.S.2014. The charging document specified that these counts related to the act of performing cunnilingus on B.R. A felony count was charged under section 18–3–402(1)(a), alleging that Morales caused B.R. to submit "by means of sufficient consequence reasonably calculated to cause submission against the victim's will." A misdemeanor count was charged under section 18–3–402(1)(e), relating to the circumstances that B.R. was between fifteen and seventeen years old and Morales was ten years older than her and not her spouse.

¶ 6 Additionally, Morales was charged with one count of criminal attempt to commit sexual assault in violation of sections 18–3–402(1)(a) and 18–2–101(1), C.R.S.2014. According to the charging document, this count related to B.R.'s allegation that Morales attempted to inflict sexual penetration by penetration of her vagina with his penis.

¶ 7 A jury found Morales guilty on all counts. As to the felony sexual assault, the trial court sentenced him to prison for an indeterminate term of ten years to life. The court also imposed concurrent three- and two-year sentences for the attempted and misdemeanor sexual assaults, respectively. The latter sentences were to run concurrently with the indeterminate term.

## II. *Batson* Challenge

¶ 8 Morales seeks a limited remand for the trial court to make a better record on the third step of his *Batson* challenge. We disagree that a remand is necessary because we conclude that the court properly determined that Morales failed to make a prima facie showing of discrimination at step one of the *Batson* analysis.

### A. Law and Applicable Standard of Review

¶ 9 The use of peremptory challenges to purposefully discriminate against prospective jurors based solely on their race, ethnicity, or sex violates the Equal Protection Clause of the federal constitution. *Rivera v. Illinois*, 556 U.S. 148, 153, 129 S.Ct. 1446, 173 L.Ed.2d 320 (2009); *Batson v. Kentucky*, 476 U.S. 79, 84, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). An allegation that a party has discriminated in this way is commonly known as a *Batson* challenge. *See Valdez v. People*, 966 P.2d 587, 589–90 (Colo.1998).

¶ 10 When considering a *Batson* challenge from a defendant, a trial court must apply a three-step analysis. *Craig v. Carl-*

*son,* 161 P.3d 648, 654 (Colo.2007). First, the defendant must make a prima facie showing that the prosecution exercised a peremptory challenge to exclude a prospective juror for discriminatory reasons. Second, if the defendant satisfies the first step, the burden shifts to the prosecution to provide a non-discriminatory explanation. Third, if the prosecution has articulated a neutral explanation, the court must decide whether the defendant has proved purposeful discrimination. *Batson,* 476 U.S. at 96–98, 106 S.Ct. 1712.

¶ 11 The first two steps of the *Batson* analysis are reviewed de novo. *Valdez,* 966 P.2d at 590–91. The third step involves an issue of fact and thus is reviewed for clear error. *Id.* at 590.

### B. Trial Court Proceedings

¶ 12 The prosecutor exercised her second peremptory challenge to excuse Juror No. 17, a woman who appeared to defense counsel to be Hispanic. Defense counsel did not raise a *Batson* challenge regarding that strike. The prosecutor used her third peremptory strike to excuse Juror No. 10, whom defense counsel also believed to be a Hispanic woman. The following discussion ensued:

[DEFENSE COUNSEL]: At this time the defense makes a *Batson* challenge as to the [sic] Juror No. 10. I do not believe a pattern needs to be shown in order to make a *Batson* challenge. But in this case there's a pattern. The prosecution dismissed Juror No. 17, who appeared to me to be [a] Hispanic female. And the prosecutor just dismissed Juror No. 10. And from either person, I didn't hear anything I believe would serve as a basis for even a peremptory.

THE COURT: Is Juror No. 10 Hispanic?

[PROSECUTOR]: No.

THE COURT: I didn't think Juror No. 10 was Hispanic. And for the record, she didn't appear to be Hispanic to me. I didn't realize that.... Her name was [F.S.]. So I don't know if that appears to be some sort of Middle Eastern name. Frankly, I'm guessing. But she did not appear to be Hispanic to me.

[DEFENSE COUNSEL]: Can I see how it's spelled? ... I think to me she appeared to be, based on the name....

[PROSECUTOR]: Does the Court at this time believe the defense has met its burden regarding *Batson* and is asking ... the prosecution for a non-race-based purpose for using the peremptory challenge?

THE COURT: I find the defense is struggling with if she's Hispanic. I find that does not establish a pattern of striking Hispanic jurors. I'm not requiring you to state your reason for having struck the juror. Although, I think the record would be better preserved if you were willing to do so.

...

[DEFENSE COUNSEL]: ... I don't believe a pattern needs to be shown. And I can still make a prima facie argument based on the gender. And the Middle Eastern[.] [A]s to questioning, I don't recall. I don't believe I questioned her at all. And the prosecutor did normal questioning, and I didn't—I don't recall any reactionable [sic] answers.

THE COURT: The *Batson* challenge based on gender?

[DEFENSE COUNSEL]: And on Middle Eastern. And I would say she did appear to me to be not Caucasian.

THE COURT: I'm not finding a pattern has been established. But you [prosecutor] have the opportunity, if you wish, to state your reason for excusing Juror No. 10.

[PROSECUTOR]: ... Judge, I don't believe the defense has met its burden pursuant to *Batson.* However, solely for purposes of preserving the record for appeal, the prosecution can indicate this witness specifically indicated she had never drank [sic] alcohol as a teenager. Her friends had, but she was the one that didn't. She took care of them, but never had that experience herself. Given the information contained in the facts that will come out in this case, we have a 16–year–old who was drinking heavily. And it appears that this juror cannot even potentially understand what that is like, given she did not do it.

THE COURT: The prosecution has stated a reason for striking Juror No. 10. Thank you.

¶ 13 Thereafter, defense counsel moved on to his next peremptory strike. No further record was made as to the *Batson* challenge.

## C. Which Step?

¶ 14 Morales asks us to remand this case for additional proceedings on his *Batson* challenge to afford him a further opportunity to rebut the prosecutor's step-two proffer, and to allow the trial court to make express step-three findings. Morales also acknowledges, however, that the trial court denied his *Batson* challenge at step one but gave the prosecutor the opportunity to respond to the challenge if she wished.[1]

¶ 15 This is not a case where the first step of the *Batson* analysis was rendered moot because the trial court proceeded to rule on the ultimate question of intentional discrimination. *See People v. Vieyra*, 169 P.3d 205, 211 (Colo.App.2007); *People v. Gabler*, 958 P.2d 505, 508 (Colo.App.1997); *but cf. Valdez*, 966 P.2d at 592 (holding that, because the trial court's ruling was limited to step one and the court never reached steps two or three, the prima facie issue was not moot).

¶ 16 Instead, we conclude that, as in *Valdez*, the trial court ended its analysis at step one by determining that Morales had not demonstrated a prima facie showing of discrimination. *See* 966 P.2d at 592–93. We acknowledge that the court gave the prosecutor the option to explain the reason for her strike. The court made clear, however, that an explanation was not required. And the prosecutor prefaced her explanation by stating—without correction from the court—that she did not believe that the defense had met its burden at step one, and that she would explain "solely for purposes for preserving the record for appeal." *See People v. Farbes*, 973 P.2d 704, 706 (Colo.App.1998) ("[P]ermitting the prosecutor to put her explanations on the record did not render the prima facie showing issue moot, since the trial court at that point had already ruled that defendant had failed to make the requisite prima facie showing.").

¶ 17 Moreover, the trial court never made a step-three finding, which is necessary to a

determination that step one became moot. *See Valdez*, 966 P.2d at 592 (prima facie showing becomes moot only after "the trial court has ruled on the ultimate question of intentional discrimination (i.e., the third step of *Batson*)"). After the prosecutor explained her reason for striking the juror, the court simply noted, "The prosecution stated a reason for striking Juror No. 10. Thank you." This statement is similar to the trial court's remark in *Valdez*: "Thank you. I think the record on that is complete." *Id.* Hence, as in *Valdez*, the court's conclusory statement here was not a step-three finding. *See id.* at 592–93.

¶ 18 Therefore, we turn to a de novo review of whether Morales established a prima facie case at step one. *See id.* at 591, 593.

## D. Prima Facie Showing of Discriminatory Purpose

¶ 19 A trial court must presume initially that a prosecutor has exercised peremptory challenges on constitutionally permissible grounds, and the burden rests with the defendant to show otherwise by establishing a prima facie case of purposeful discrimination. *Farbes*, 973 P.2d at 706. The trial court should consider all relevant circumstances. *Batson*, 476 U.S. at 96–97, 106 S.Ct. 1712; *Valdez*, 966 P.2d at 589. "[A] prima facie case of discrimination can be made out by offering a wide variety of evidence, so long as the sum of the proffered facts gives 'rise to an inference of discriminatory purpose.'" *Johnson v. California*, 545 U.S. 162, 169, 125 S.Ct. 2410, 162 L.Ed.2d 129 (2005) (footnote omitted) (quoting *Batson*, 476 U.S. at 94, 106 S.Ct. 1712). "The burden of persuasion is always on the party who alleges discrimination in jury selection." *Valdez*, 966 P.2d at 589.

¶ 20 In assessing whether the defendant has raised such an inference, the court may consider, among other things, the disproportionate effect of peremptory strikes, a pattern of strikes against jurors in a particular class, and the prosecutor's questions and statements during voir dire. *People v. Ho-*

---

1. Morales explains in his opening brief that "[t]he court denied the challenge on the basis that the defense had not established a pattern but said it would give the prosecution the opportunity to respond 'if you wish.'"

*gan,* 114 P.3d 42, 52 (Colo.App.2004); *accord Batson,* 476 U.S. at 96–97, 106 S.Ct. 1712; *Craig,* 161 P.3d at 654 (the pattern of strikes, number of women on the jury before and after the strikes, and initial responses of both parties to the *Batson* challenge supported an inference of discrimination). "However, a systematic pattern of exclusions is neither necessary nor sufficient for making a prima facie showing." *Hogan,* 114 P.3d at 52. For three reasons, we conclude that Morales did not meet his burden of making out a prima facie case of discrimination.

¶ 21 First, Morales's counsel made no proffer to the trial court concerning the disproportionate effect of the prosecutor's peremptory strikes. *See id.* For example, counsel made no arguments about how many women or "Middle Eastern" people were on the jury panel before and after the prosecutor exercised her peremptory challenges. *See Craig,* 161 P.3d at 654. The juror questionnaires and voir dire transcript do not reflect the ethnicity of any of the jurors. And Morales did not otherwise create a record indicating whether Middle Eastern jurors were disproportionately affected. *See Hogan,* 114 P.3d at 53 (the record does not suggest an inference of discrimination when it does not reveal whether other members of the cognizable group were on the panel after a challenge or ultimately served on the jury). We do note, however, that the final jury was composed of seven women, five men, and one male alternate.[2] Because the evidence does not support a showing of discriminatory strikes against either women or people of Middle Eastern ethnicity, we discern no support for the conclusion that the prosecutor's challenges had a disproportionate effect.

¶ 22 Second, we agree with the trial court that Morales did not establish a pattern of prohibited strikes. *Id.* at 52. Defense counsel eventually conceded that Juror No. 10 was not Hispanic but rather appeared to be of Middle Eastern descent. And, as noted, the record does not reveal the ethnicity of any of the other jurors. Thus, the record does not show a pattern of strikes based on ethnicity. *See id.* at 53 ("[D]efendant bears the burden of persuasion on this first step

and, thus should bear the consequences of failing to place supporting information on the record."); *cf. Gray v. Brady,* 592 F.3d 296, 306 (1st Cir.2010) ("As other federal courts have noted in rejecting claims of discrimination against 'non-whites' in jury selection, it is open to serious question whether such a class of persons possesses the definable quality, common thread of attitudes or experiences, or community of interests essential to recognition as a 'group.' ").

¶ 23 Morales did not argue to the trial court that the prosecutor engaged in a pattern of strikes against women. Nonetheless, we observe that the prosecutor exercised only four of her six allotted peremptory challenges, and she struck two women and two men. She then passed on the opportunity to exercise a challenge when the jury panel comprised eight women, four men, and an additional female alternate. After that, the prosecutor passed upon her final opportunities to strike the last two available jurors: one man and one woman. And, as noted, the final jury included more women than men. *See Valdez,* 966 P.2d at 594 (the fact that four African–Americans were included on the final jury was particularly relevant in light of the prosecutor's decision not to exercise all available peremptory challenges); *People v. Saiz,* 923 P.2d 197, 206 (Colo.App.1995) (no prima facie showing supported where six people with Spanish surnames were on the final jury). Thus, the record refutes any pattern of prosecution strikes against women.

¶ 24 Third, Morales did not direct the trial court's attention to any questions or statements of the prosecutor during voir dire that would support an inference of a discriminatory purpose. *See Hogan,* 114 P.3d at 52; *People v. Gardenhire,* 903 P.2d 1165, 1170 (Colo.App.1995) (affirming trial court's denial of a *Batson* challenge at step one where the defendant did not present facts creating an inference of discrimination and pointed to no comments by the prosecutor that would support such an inference). To the contrary, we see no indication in the record that the pros-

2. The parties knew in advance that the juror with the highest summons number would be designat-

ed the alternate.

ecutor ever mentioned race, ethnicity, or gender during voir dire.

¶ 25 In sum, merely identifying cognizable groups to which the excluded juror might have belonged was insufficient, without more, to establish a prima facie showing of purposeful discrimination. *See Hogan,* 114 P.3d at 52 ("[M]erely that a member of a racial group has been peremptorily excluded from the jury does not necessarily establish a prima facie showing of discrimination; step one of the *Batson* process also requires that the circumstances of the case raise an inference that the strike was based on race."); *id.* at 53 (citing *United States v. Stavroulakis,* 952 F.2d 686 (2d Cir.1992), for the proposition that "reference merely to the race of one excused venireperson, without more, is insufficient to raise an inference of discrimination"). While the burden "is not an onerous one," *Valdez,* 966 P.2d at 596, Morales did not meet his burden to "present evidence sufficient to raise an inference that discrimination occurred." *See id.* at 590.

¶ 26 Accordingly, we, like the trial court, must rely on the presumption that the prosecutor exercised her peremptory challenges in a constitutional manner. *See Farbes,* 973 P.2d at 706. We affirm the denial of the *Batson* challenge.

## III. Requirement of Penetration to Accomplish Sexual Assault by Cunnilingus

¶ 27 Morales contends that the evidence was not sufficient to prove that he committed the crime of sexual assault. In support of this charge, the prosecution presented evidence that Morales performed cunnilingus on B.R. Morales asserts, however, that this evidence was insufficient to establish the sexual penetration element of sexual assault. Morales maintains that the prosecution was also required—but failed—to prove that he inflicted "any penetration, however slight." § 18–3–401(6), C.R.S.2014.

¶ 28 Relatedly, Morales argues, for the first time on appeal, that the jury instruction defining "cunnilingus" impermissibly lowered the prosecution's burden of proof because it did not inform the jury that penetration was

required to establish sexual penetration by means of cunnilingus.

¶ 29 Because we conclude that the evidence in this case was sufficient to prove penetration ("however slight"), we need not decide whether the prosecution must always prove such penetration in order to satisfy the element of sexual penetration by means of cunnilingus. We also hold that the jury instruction did not constitute plain error.

### A. Sufficiency of the Evidence

#### 1. Standard of Review

¶ 30 In the trial court, Morales moved for a judgment of acquittal on the same grounds that he raises on appeal. We review de novo whether the record contains sufficient evidence to support a conviction. *People v. Roggow,* 2013 CO 701, ¶13 318 P.3d 446; *People v. Aryee,* 2014 COA 94, ¶ 30, 356 P.3d 918. "In so doing, we must determine whether the relevant evidence, when viewed as a whole in the light most favorable to the prosecution, is sufficient to support a conclusion by a reasonable mind that the defendant is guilty of the charges beyond a reasonable doubt." *Roggow,* ¶ 13.

#### 2. Analysis

¶ 31 Sexual assault in violation of section 18–3–402 requires the knowing infliction of either sexual intrusion[3] or sexual penetration on a victim. Sexual penetration is defined as follows:

"Sexual penetration" means sexual intercourse, cunnilingus, fellatio, analingus, or anal intercourse. Emission need not be proved as an element of any sexual penetration. Any penetration, however slight, is sufficient to complete the crime.

§ 18–3–401(6). Citing the third sentence of this definition, Morales contends that evidence of "penetration, however slight" is necessary to prove any form of sexual penetration, including by means of cunnilingus. The People argue that the third sentence (as well as the second sentence) applies only to the forms of sexual penetration involving a penis.

3. At trial, the parties agreed not to instruct the jury on "sexual intrusion."

¶32 As noted, we need not resolve this dispute because the evidence here was sufficient to permit a finding of penetration.

¶33 At trial, B.R. twice testified that Morales "kissed me on my vagina." But she denied feeling anything "insert" into her vagina. B.R. further stated that the kissing was not inside of her vagina, but "[i]t was just like on top."

¶34 In response to defense counsel's motion for judgment of acquittal, the prosecutor argued:

[I]t is extremely reasonable to believe that when a person is kissing the vaginal opening of a female that there is going to be penetration, however slight. I understand that [B.R.] did not state that anything was inserted. However, whether there was slight penetration, I think is absolutely plausible and reasonable under the testimony.

We agree that B.R.'s testimony suggested that, even if she did not feel anything "insert" into her vagina, "any penetration, however slight" occurred.

¶35 "[C]unnilingus" was defined for the jury as "any act of oral stimulation of the vulva or clitoris." From an anatomical perspective, B.R.'s testimony that Morales kissed her "on" her vagina implied that Morales penetrated at least some of the parts of B.R.'s vulva, however slightly, to reach the opening of her vagina. See People v. Taylor, 131 P.3d 1158, 1164 (Colo.App.2005) ("Where the sufficiency of the evidence is challenged on appeal ... we must draw all reasonable inferences in favor of the prosecution."); see also State v. Beaulieu, 674 A.2d 377, 378 (R.I.1996) ("From ... the medical anatomy viewpoint, the act of cunnilingus, which requires the ... tongue to reach the female vagina, assumes the necessary penetration ... into the female genitalia.").

¶36 Hence, viewed in the light most favorable to the prosecution, B.R.'s testimony was sufficient to permit a reasonable juror to find that "any penetration, however slight" occurred when Morales kissed her "on" her vagina. "[W]e decline to require that a victim, especially a youthful victim, testify about an act of cunnilingus in vocabulary used by a gynecologist or provide a detailed description which might otherwise be found in some sordid novel." State v. Brown, 225 Neb. 418, 405 N.W.2d 600, 606–07 (1987); cf. State v. Ludlum, 303 N.C. 666, 281 S.E.2d 159, 162 (1981) (rejecting an interpretation of the term cunnilingus that would "saddle the criminal law with hypertechnical distinctions and the prosecution with overly complex and in some cases impossible burdens of proof"). The evidence was therefore sufficient to support Morales's convictions for sexual assault.

## B. Jury Instruction

¶37 Morales contends that the jury instruction defining "cunnilingus" constituted reversible error because it did not require the jury to find that some penetration occurred. We disagree.

### 1. Standard of Review

¶38 We review de novo the question of whether a jury instruction accurately informed the jury of the governing law. People v. Carbajal, 2014 CO 60, ¶10, 328 P.3d 104. Because Morales did not object at trial to the jury instruction defining cunnilingus, we review his contention on appeal for plain error. People v. Vecellio, 2012 COA 40, ¶31, 292 P.3d 1004. A plain error is both obvious and substantial, and is one that so undermined the fundamental fairness of the proceeding as to cast serious doubt on the reliability of the conviction. Id. ¶32.

### 2. Analysis

¶39 The Colorado Model Jury Instructions advise that a definition of cunnilingus "must be given with" the instruction defining sexual penetration under section 18–3–401(6). See COLJI–Crim. F(238) (2008); see also COLJI–Crim. F:343 (2014) (cross-referencing the definition of cunnilingus in the model definition for sexual penetration). Consistent with this advice, the trial court gave the jury the definition provided by the Model Jury Instructions, which happens to be derived from the prostitution statute. See § 18–7–201(2)(b), C.R.S.2014 ("'Cunnilingus,' as used in this section, means any act of oral stimulation of the vulva or clitoris.").

¶40 On appeal, Morales contends that giving the jury this definition was plain error because, in his view, it may be used only in

connection with prostitution offenses. *See id.* (defining cunnilingus *"as used in this section"*) (emphasis added); § 18–1–901(1), C.R.S.2014 ("Definitions set forth in any section of this title apply wherever the same term is used in the same sense in another section of this title unless the definition is specifically limited or the context indicates that it is inapplicable.").

¶ 41 For three reasons, we are not persuaded that plain error occurred. First, the prostitution statute's definition is practically identical to the dictionary definition. *See Webster's Third New International Dictionary* 554 (2002) (defining *cunnilingus* as "stimulation of the vulva or clitoris with the lips or tongue"). Thus, the definition given to the jury conveyed the common meaning of the term. *See People v. Daniels*, 240 P.3d 409, 411 (Colo.App.2009) ("When a statute does not define its terms but the words used are terms of common usage, we may refer to dictionary definitions to determine the plain and ordinary meaning of those words."). That this common meaning is also found in an allegedly unrelated statute is of no consequence.

¶ 42 Second, as noted, the prostitution statute's definition has been adopted as the Model Jury Instructions' sole definition of cunnilingus. While not binding, these pattern instructions and their accompanying comments are intended as guidelines and should be considered by trial courts. *See People v. Rester*, 36 P.3d 98, 102 (Colo.App. 2001). Thus, in the absence of an objection, we do not believe it should have been obvious to the trial court that it should not use the definition provided by the pattern instructions.

¶ 43 Third, in addition to the definition of cunnilingus, the jury received the definition of sexual penetration from section 18–3–401(6). According to Morales, the plain language of this definition of sexual penetration requires some degree of penetration, "however slight," even if the act at issue is cunnilingus. In effect, therefore, Morales acknowledges that the jury was instructed that, in order to find sexual penetration, it must first find that his act of cunnilingus included some penetration.

¶ 44 Accordingly, the definitional instruction did not constitute plain error.

## IV. Double Jeopardy

¶ 45 Although he did not raise the issue to the trial court, Morales contends that one of his convictions must be vacated to comport with the prohibition against double jeopardy. Specifically, he claims that he should not stand convicted and sentenced for both the felony sexual assault and attempted felony sexual assault because the actions underlying both convictions in fact constitute a single crime. We agree.

### A. Standard of Review

¶ 46 Divisions of this court have split on whether to review unpreserved double jeopardy claims: some divisions have reviewed such claims for plain error, while others have declined to review them altogether. *E.g., People v. Tillery*, 231 P.3d 36, 47–48 (Colo.App.2009) (discussing the split), *aff'd sub nom. People v. Simon*, 266 P.3d 1099, 1104–06 (Colo.2011).[4] We are persuaded that the better view is to review unpreserved double jeopardy claims for plain error under Crim. P. 52(b). *See Tillery*, 231 P.3d at 47–48; *see also People v. Greer*, 262 P.3d 920, 931–38 (Colo.App.2011) (J. Jones, J., specially concurring) (unpreserved constitutional claims are reviewable for plain error, provided they do not require further factual development, were not waived, and are adequately presented on appeal).

4. In an apparent effort to resolve this conflict, our supreme court has granted writs of certiorari in several cases raising this issue. *See People v. Zadra*, 2013 COA 140 (*cert. granted* Sept. 29, 2014); *People v. Hill*, 2013 WL 4047498 (Colo. App. No. 12CA0168, Aug. 8, 2013) (not published pursuant to C.A.R. 35(f)) (*cert. granted* June 30, 2014); *People v. Reyna–Abarca*, 2013 WL 4008874 (Colo.App. No. 10CA0637, Aug. 1, 2013) (not published pursuant to C.A.R. 35(f)) (*cert.* *granted* June 30, 2014); *People v. Smoots*, 2013 COA 153, 338 P.3d 398 (*cert. granted* June 30, 2014); *People v. Zubiate*, 2013 COA 69, —— P.3d —— (*cert. granted* June 16, 2014); *People v. Bunce*, 2013 WL 3974719 (Colo.App. No. 12CA0622, July 25, 2013) (not published pursuant to C.A.R. 35(f)) (*cert. granted* June 16, 2014); *People v. Scott*, 2012 WL 5448747 (Colo.App. No. 08CA2327, Nov. 8, 2012) (not published pursuant to C.A.R. 35(f)) (*cert. granted* Nov. 25, 2013).

¶ 47 We therefore review Morales's claim to determine whether error occurred and, if so, whether it was obvious and there is "a reasonable possibility that the error contributed to the sentence." *Tillery*, 231 P.3d at 48 (noting that, in the double jeopardy context, "the answer would invariably be 'yes'"). If we conclude that a double jeopardy violation occurred, it will likely constitute plain error. *See id.*

### B. Law Applicable to Double Jeopardy Multiplicity Issues

¶ 48 The Double Jeopardy Clauses of the United States and Colorado Constitutions protect an individual from being subjected to multiple punishments for the same offense. U.S. Const. amend. V; Colo. Const. art. II, § 18; *Woellhaf v. People*, 105 P.3d 209, 214 (Colo.2005). But they do not "prevent the General Assembly from specifying multiple punishments based upon the same criminal conduct." *Woellhaf*, 105 P.3d at 214. "[I]f the General Assembly has not conferred specific authorization for multiple punishments, double jeopardy principles preclude the imposition of multiple sentences." *Id.*

¶ 49 Morales contends that his convictions reflect multiplicity, "which occurs when the same offense is charged in multiple counts and results in multiple punishments." *See People v. Borghesi*, 66 P.3d 93, 98 (Colo. 2003); *accord Quintano v. People*, 105 P.3d 585, 589 (Colo.2005). "[T]he vice of multiplicity is that it may lead to multiple sentences for the same offense and thereby implicate double jeopardy protections." *Woellhaf*, 105 P.3d at 214.

¶ 50 Multiplicity problems may arise when a statute provides for "alternate ways of committing the same offense." *Id.* at 215. "In these situations, whether multiple punishments are permissible entails a determination of the legislatively prescribed unit of prosecution." *Id.* "'Unit of prosecution' refers to the extent to which the relevant statute permits the prosecution to separate the defendant's conduct into discrete acts for purposes of prosecuting multiple offenses." *Quintano*, 105 P.3d at 590. As our supreme court has explained:

For a host of reasons, including not only its assessment of the appropriateness of multiple punishments but also the practical consequences of requiring that similar or related acts be distinguishable, the legislature may very well choose to define a series of acts, related along a continuum of conduct or motivated by a single objective, for example, as a single crime.

*People v. Abiodun*, 111 P.3d 462, 465 (Colo. 2005).

¶ 51 The supreme court has "adopted a two-prong test for determining the legislatively prescribed unit of prosecution and then applying the legislative prescription to the facts of the case." *Woellhaf*, 105 P.3d at 215. "[T]he issue involves 'first, an examination of the scope of prosecution authorized by the statutory prescription, and, next, an examination of the factual components of each prosecution and the evidence in support thereof.'" *Id.* (quoting *People v. Williams*, 651 P.2d 899, 902–03 (Colo.1982)).

¶ 52 Within this framework, we must determine whether Morales's actions in inflicting sexual penetration on B.R. by performing cunnilingus on her and in attempting to inflict sexual penetration by trying to put his penis in her vagina constituted the same offense or multiple offenses under the sexual assault statute.

### C. The Evidence In This Case Reflects a Single Offense

¶ 53 We first assess the unit of prosecution. *Woellhaf*, 105 P.3d at 215. "The unit of prosecution is the manner in which a criminal statute permits a defendant's conduct to be divided into discrete acts for purposes of prosecuting multiple offenses." *Id.* "Thus, whether a particular course of conduct involves one or more distinct 'offenses' under the statute depends on legislative choice." *Id.*

¶ 54 "To determine the unit of prosecution, we look exclusively to the statute." *Id.* We apply the following principles:

In construing a statute, we must ascertain and effectuate the legislative intent. The General Assembly's intent is to be discerned when possible from the plain and

ordinary meaning of the statutory language. However, if the statutory language is ambiguous and therefore susceptible to alternate constructions, we look to principles of statutory construction to ascertain legislative intent.

*Id.* (citations omitted).

¶ 55 At issue is the unit of prosecution for sexual assault accomplished by sexual penetration. As relevant here, "[a]ny actor who knowingly inflicts . . . sexual penetration on a victim commits sexual assault if: (a) [t] he actor causes submission of the victim by means of sufficient consequence reasonably calculated to cause submission against the victim's will." § 18–3–402(1)(a). Section 18–3–401(6), as explained, defines "sexual penetration" in relevant part as "sexual intercourse, fellatio, cunnilingus, analingus, or anal intercourse." The plain language of these provisions does not "specifically authorize[ ] multiple punishments for each discrete act" of sexual penetration that occurs within a single incident of sexual assault. *See Woellhaf,* 105 P.3d at 216.

■ ¶ 56 Further, "where . . . a number of acts are joined as a disjunctive series, in a single sentence, without any attempt to differentiate them by name or other organizational device, a legislative intent to permit separate convictions and sentences for each enumerated act is not so readily apparent." *Abiodun,* 111 P.3d at 466; *see People v. Swain,* 959 P.2d 426, 430 n. 12 (Colo.1998) ("Generally, the word 'or' is a disjunctive particle that denotes an alternative. . . ."). Instead, the legislature's use of the word "or" when listing the types of conduct constituting sexual penetration suggests the intent merely to define "alternative means of committing the same offense." *See Woellhaf,* 105 P.3d at 218. That is, by listing five types of conduct in the definition and separating them by the word "or," the legislature intended to describe alternative means of committing the element of sexual penetration in a single sexual assault, rather than to create separate offenses as to each type of sexual penetration. *See Abiodun,* 111 P.3d at 467; *see also Woellhaf,* 105 P.3d at 217 ("By demarcating intimate parts with the disjunctive 'or,' the General Assembly did not prescribe multiple offenses or otherwise alter the scope of the unit of prosecution."); *People v. Viduya,*

703 P.2d 1281, 1292 (Colo.1985) (use of the disjunctive "or" created alternate ways of committing the single offense of vehicular homicide); *People v. Holmes,* 129 Colo. 180, 182, 268 P.2d 406, 407 (1954) (applying same to burglary); *Wright v. People,* 116 Colo. 306, 310, 181 P.2d 447, 449 (1947) (applying same to forgery); *People v. Friend,* 2014 COA 123M, ¶¶ 62–65, —— P.3d —— (applying same to child abuse).

¶ 57 We thus interpret the sexual assault statute and the statutory definition of sexual penetration "to preclude legally separate offenses" for each type of sexual penetration that occurs "irrespective of the context within a course of conduct." *See Woellhaf,* 105 P.3d at 218 ("[I]f more than one of the proscribed methods is used to accomplish the offense, a court may not infringe on the General Assembly's role by imposing multiple punishments for each prohibited method a defendant uses.").

■■ ¶ 58 Of course, "[t]he prosecution may pursue multiple convictions if the underlying evidence supports factually distinct offenses." *Id.* But evidence showing only that different types of sexual penetration occurred is not sufficient, without more, to establish distinct sexual assaults. *Cf. id.* at 219 (jury's finding that the defendant inflicted multiple types of sexual contact was not sufficient, without more, to prove multiple offenses of sexual assault on a child); *Quintano,* 105 P.3d at 591 ("[E]ach touching is not axiomatically a separate offense."); *People v. Mintz,* 165 P.3d 829, 835 (Colo.App.2007) (concluding that the defendant's imposition of both penile contact and digital contact constituted a single sexual assault where the evidence showed that both types of sexual contact took place at the same time and place with no apparent break between acts). Under section 18–3–402(1), each unit of prosecution for sexual assault by means of sexual penetration requires evidence of sexual penetration that transpired in a factually distinct act or incident.

■ ¶ 59 We now turn to whether Morales's conduct "constitutes factually distinct acts, and therefore, factually distinct offenses" such that "the conduct satisfies more than one defined unit of prosecution." *See*

*Woellhaf,* 105 P.3d at 219. "[W]e look to all the evidence introduced at trial to determine whether the evidence on which the jury relied for conviction was sufficient to support distinct and separate offenses." *Quintano,* 105 P.3d at 592. Relevant factors include "whether the contacts occurred at different locations, were the product of new volitional departures, or were separated by intervening events." *Woellhaf,* 105 P.3d at 219 (citing *Quintano,* 105 P.3d at 591–92). We may also consider the "temporal and spatial proximity" of the events. *Abiodun,* 111 P.3d at 470.

¶ 60 The record in this case contains little evidence suggesting separate offenses. All of the sexual conduct Morales inflicted on B.R. occurred within five minutes or less, with no break in time between the different sexual acts. And there was no evidence of intervening events. *Cf. Quintano,* 105 P.3d at 592 (separate offenses were demonstrated by "sufficient breaks between each incident to allow the defendant time to reflect"). No evidence suggested that B.R. told Morales to stop any certain type of conduct or pushed him away in between the different types of sexual conduct that occurred within a few minutes. *Cf. id.* (separate offenses were supported by the fact that the defendant "persisted after the victim admonished him to stop several times"). There does not appear to have been any other kind of break in Morales's actions or any other suggestion of a fresh impulse or opportunity to renew the intent to inflict a new assault. *Cf. id.* ("[T]he defendant's statements supported the forming of renewed intentions."). Further, all of the conduct occurred in the same location. *Cf. id.* (separate offenses were supported by the fact that "[e]ach incident occurred in a different location").

¶ 61 Accordingly, we do not discern "circumstances offering the defendant an opportunity to reflect before embarking on a new course of conduct." *Woellhaf,* 105 P.3d at 219; *see Quintano,* 105 P.3d at 592 (recognizing that, in order to sustain multiple convictions, "all jurisdictions appear to require either that the defendant's acts of sexual perpetration not be so close in time, or be so lacking in intervals, that they constitute a single offense of sexual contact"). Because we cannot discern from the evidence or the counts that the acts were separated in time,

occurred in different locations, or were the product of new volitional departures, we must conclude that the acts were not distinct offenses. *See Mintz,* 165 P.3d at 834.

¶ 62 We also conclude that the error in imposing multiple punishments for Morales's conduct was obvious. *Woellhaf* and *Quintano* made clear that subjecting a victim to different types of sexual conduct does not, without more, constitute different sexual offenses. Those cases also set out an analysis for determining whether a particular course of sexual conduct may constitute more than one violation of the same statute. Under that analysis, it is plain that the different types of conduct Morales inflicted or attempted to inflict on B.R. were not separated to the degree necessary to constitute multiple, separate offenses. Hence, plain error occurred.

¶ 63 Because Morales's separate convictions for felony sexual assault and attempted felony sexual assault violate double jeopardy principles, they must be merged into a single conviction. *See Mintz,* 165 P.3d at 834. When multiple convictions must be merged, the effect of the jury's verdict should be maximized. *People v. Medrano–Bustamante,* 2013 COA 139, ¶ 76, —— P.3d —— (citing *People v. Glover,* 893 P.2d 1311, 1314 (Colo.1995)) (*cert. granted on other grounds* Sept. 8, 2014). We therefore vacate Morales's conviction and sentence for attempted felony sexual assault. On remand, the trial court shall merge Morales's conviction for attempted felony sexual assault into his conviction for felony sexual assault, and resentence him accordingly.

V. Conclusion and Remand Order

¶ 64 Morales's conviction and sentence for attempted felony sexual assault are vacated, and the case is remanded to the trial court to resentence Morales for only one count of felony sexual assault. In all other respects, the judgment is affirmed.

JUDGE WEBB and JUDGE FURMAN concur.