22CA1589 Peo v Rojas 05-22-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 22CA1589
Weld County District Court No. 21CR876
Honorable Marcello A. Kopcow, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Theodore Anthony Rojas II,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division A
Opinion by JUDGE BROWN
Dunn and Schock, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced May 22, 2025

---

Philip J. Weiser, Attorney General, Katharine Gillespie, Senior Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Daniel J. Sequeira, Deputy
State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, Theodore Anthony Rojas II, appeals the judgment of conviction entered on a jury verdict finding him guilty of two counts of felony menacing.  Rojas contends that (1) insufficient evidence supports these convictions; (2) the district court incorrectly instructed the jury on the definition of "threat"; (3) the prosecutor committed misconduct; and (4) the court erred by identifying the weapon used to menace as a "tomahawk."  We affirm.

## I.     Background

¶ 2     The evidence presented at a three-day trial allowed the jury to find the following facts.

¶ 3     Rojas and his cousins, Ernest and Felix Rojas,[1] disputed which of them owned certain real property located in Weld County.  In November 2020, Ernest evicted Rojas from the property and obtained a protection order against him.

¶ 4     One day in April 2021, Felix arrived at the property and saw Rojas attempting to pull a camper onto it.  Rojas had also moved his things into a building on the property.  Felix called 911 to report

---

[1] Because they share a last name with Rojas, we refer to Ernest and Felix by their first names and mean no disrespect by doing so.

1

that Rojas was trespassing.  While Felix was on the phone with the 911 operator, Rojas went inside the building and came back out with a firearm on his hip.[2]

¶ 5    Deputies Christopher Dalzell and Alex Fischer responded to the call, and their body cameras captured their interaction with Rojas.  At one point after the deputies told Rojas he had to leave the property, Rojas picked up a hatchet[3] and a machete.  He walked toward the deputies with the hatchet raised to his shoulder while making statements like, "This is my house, this is where I live, this is my shit, and if you shoot me, you shoot me."

¶ 6    For Rojas' conduct that day, the People charged him with eleven crimes, including, as relevant here, two counts of felony menacing — one count each for Deputies Dalzell and Fischer.  The jury found Rojas guilty of both counts of felony menacing, and the

---

[2] Deputies later learned that the firearm was an unloaded BB gun.
[3] Rojas argues that the axe-like weapon is a "hatchet," which he says has a smaller head and a shorter, thicker handle, rather than a "tomahawk," which he says has a head with a protrusion and a longer, thinner handle.  The prosecution referred to the weapon as a tomahawk throughout trial.  We will refer to the weapon as a hatchet unless we are quoting the record.

court sentenced him to two concurrent six-year sentences in community corrections.

## II. Sufficiency of the Evidence

¶ 7 Rojas contends that the prosecution presented insufficient evidence to sustain his felony menacing convictions. We are not persuaded.

### A. Standard of Review and Applicable Law

¶ 8 "We review the record de novo to determine whether the evidence before the jury was sufficient both in quantity and quality to sustain the defendant's conviction." *Clark v. People*, 232 P.3d 1287, 1291 (Colo. 2010). We consider "whether the relevant evidence, both direct and circumstantial, when viewed as a whole and in the light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable mind that the defendant is guilty of the charge beyond a reasonable doubt." *Id.* (quoting *People v. Bennett*, 515 P.2d 466, 469 (1973)).

¶ 9 In doing so, we give the prosecution the benefit of every reasonable inference that may be fairly drawn from the evidence. *See id.* at 1292; *People v. Gonzales*, 666 P.2d 123, 128 (Colo. 1983). We may not reweigh the evidence or reassess the credibility of the

3

witnesses. *People v. Sharp*, 104 P.3d 252, 256 (Colo. App. 2004). Nor may we "act as a thirteenth juror" and set aside a verdict because we might have drawn a different conclusion had we been the trier of fact. *People v. McIntier*, 134 P.3d 467, 471 (Colo. App. 2005).

### B. The Prosecution Presented Sufficient Evidence to Support the Felony Menacing Convictions

¶ 10     "A person commits the crime of menacing if, by any threat or physical action, he or she knowingly places or attempts to place another person in fear of imminent serious bodily injury." § 18-3-206(1), C.R.S. 2021. At the time of Rojas' offense, menacing was a class 5 felony if committed "[b]y the use of a deadly weapon." § 18-3-206(1)(a), C.R.S. 2021.

¶ 11     Rojas contends that the prosecution failed to prove that he (1) made a "threat" or took "physical action" rising to the level of a threat; (2) "knowingly" placed or attempted to place the deputies in fear of serious bodily injury; or (3) "used" a deadly weapon. Viewing the evidence in the light most favorable to the prosecution, we reject these contentions.

### 1. Additional Background

¶ 12    The prosecution's theory of the case was that Rojas menaced the deputies with the hatchet. At trial, the prosecution presented the bodycam footage of Deputies Dalzell and Fischer, which showed the following:

- When the deputies contacted him, Rojas was wearing a "nylon-styled law enforcement duty belt" with a firearm on his hip.

- Throughout the encounter, Rojas made statements to the deputies such as, "If we want to get it on, we can get it on"; "I'm not afraid of anyone or anything"; "I'm down to die for the shit that I believe in"; "Nobody is losing their life"; and "We can see who is the better shot."

- Rojas picked up some plastic tubing off the ground, started swinging it around, and refused the deputy's initial request to drop it. Rojas then walked over to a tree stump, picked up the hatchet and machete, and said, "This is what you don't want me to pick up."

- When the deputies told Rojas to put down the weapons, Rojas threw the machete at the stump, swung the hatchet

5

at the stump, and told the deputies, "I am trying to save your fucking life." Rojas then told the deputies, "I could pick up whatever I want to, I'm not going to hurt you, but I'm not going to let you handcuff me either."

- Several minutes later, when Deputy Fischer told Rojas he needed to leave the property, Rojas responded, "I'm not leaving." Rojas returned to the tree stump, picked up the hatchet again, raised it to his shoulder, and began walking toward the deputies while saying, "This is my house, this is where I live, this is my shit, and if you shoot me, you shoot me." Deputy Fischer pulled out his firearm, backed away from Rojas, and said, "Don't do anything crazy." Rojas then put the hatchet down on a table.

¶ 13    Deputy Dalzell testified as follows:

- He moved back and repositioned himself when Rojas picked up the hatchet because Rojas could throw the hatchet at that distance.

- Rojas' repeated statements that he did not want to hurt the deputies did not lower his concern, while Rojas' other statements and actions "put [him] onto a higher alert."

6

- He felt threatened by "[t]he act of [Rojas] continuously picking [the weapons] up after we had asked him to not and then, just the statements he was making of, you know, you shouldn't be afraid of referencing the plastic tubes and then, saying this is what you should be afraid of and ultimately, picking up the tomahawk and the machete from the stump."

¶ 14    Deputy Fischer testified as follows:

- Rojas' statements made him concerned that Rojas was going to draw his gun or physically engage with the deputies.

- After Rojas said he was not going to let the deputies handcuff him, the deputy was concerned Rojas would become combative.

- He drew his weapon because he was concerned Rojas would use the hatchet against the deputies if they tried to remove him from the property.

- Rojas held the hatchet "positioned in a way that he could have easily hit us with it and was walking in our direction." He felt threatened by how Rojas held the hatchet, but the

machete in Rojas' other hand did not concern him as much because it was pointed down.

## 2. "Threat"

¶ 15    Rojas contends that the prosecution presented insufficient evidence to establish he threatened the deputies.  We are not persuaded.

¶ 16    To prove that a person made a threat, the prosecution must prove that the person "expressed a purpose or intent to cause injury or harm" to another person or their property.  *People v. Denhartog*, 2019 COA 23, ¶¶ 15-24; *see also People v. Shawn*, 107 P.3d 1033, 1035 (Colo. App. 2004) ("A threat is a statement of purpose or intent to cause injury or harm to another person.").  A threat need not be verbal; it may be made through nonverbal, expressive conduct that is intended to communicate an intent to harm. *Denhartog*, ¶ 28.

¶ 17    Here, Rojas refused the deputies' requests to leave the property, repeatedly indicated he was ready to be physically combative with the deputies or to die for his property, told the deputies he was not leaving the property, and then picked up the hatchet and machete and advanced toward the deputies with the

hatchet raised at his shoulder. We conclude that Rojas' statements and physical gestures were collectively sufficient for a reasonable jury to find beyond a reasonable doubt that Rojas expressed a purpose or intent to cause injury or harm to the deputies. *See* § 18-3-206, C.R.S. 2021; *Denhartog*, ¶¶ 24, 28.

¶ 18 We are not persuaded otherwise by Rojas' argument that he did not threaten the deputies because he repeatedly told them that he did not wish to harm them. The bodycam footage shows that Rojas' statements purportedly expressing a lack of intent to harm — "I'm not trying to hurt you" and "I don't want anybody to get hurt" — were contradicted by Rojas' other statements and actions. The jury viewed the bodycam footage and heard the witnesses' testimony, and its verdict reflects that it discounted Rojas' statements that he was not trying to hurt the deputies and credited Rojas' threatening statements and actions. It was well within the jury's province to do so. *See People v. Pitts*, 13 P.3d 1218, 1221 (Colo. 2000) ("It is the function of the [trier of fact], and not the reviewing court, to weigh evidence and determine the credibility of the witnesses."); *People v. Kessler*, 2018 COA 60, ¶ 12 ("[A] fact finder is not required to accept or reject a witness's testimony in its

9

entirety; it may believe all, part, or none of a witness's testimony. . . .").

¶ 19    Nor are we persuaded by Rojas' argument that his actions with the hatchet could not express an intent to injure or harm.  He relies on *Denhartog*, ¶ 28, to argue that physical action alone cannot constitute a threat.  But we do not read *Denhartog* so narrowly.  In that case, a division of this court held that evidence the defendant had suddenly and without warning reversed his car into an officer's motorcycle during a traffic stop was insufficient to prove he had threatened the officer.  *Id.* at ¶ 29.  It reasoned that "there was no expression of any kind of an intent to harm the officer" beyond the conduct that actually caused harm — hitting the officer with his car.  *Id.* at ¶¶ 25-28.  It rejected the People's assertion that any act that placed a person at risk constituted a threat.  *Id.* at ¶ 23.  But the *Denhartog* division did not hold that a threat must be conveyed verbally; on the contrary, the division explained that its holding did not "foreclose an interpretation of 'threaten' that includes nonverbal communication of an intent to harm."  *Id.* at ¶ 28.

¶ 20    In any event, unlike the defendant in *Denhartog*, Rojas made verbal statements while engaging in physical action that, taken

10

together, could reasonably be interpreted as threatening the deputies. Viewing the evidence in the light most favorable to the prosecution, we conclude the evidence was sufficient to establish that Rojas menaced the deputies by "threat or physical action." § 18-3-206, C.R.S. 2021; *see Clark*, 232 P.3d at 1291.

### 3. "Knowingly"

¶ 21    Rojas also contends that the prosecution failed to establish he knowingly placed or attempted to place the deputies in fear of imminent serious bodily injury. We are not persuaded.

¶ 22    Felony menacing is a general intent crime that requires the defendant to act "knowingly" — that is, the defendant must be "aware that his conduct is practically certain to cause the result." § 18-1-501(6), C.R.S. 2024; *see also People v. Crump*, 769 P.2d 496, 498 (Colo. 1989). Direct evidence of the defendant's awareness is not necessary; instead, "the defendant's subjective awareness may be inferred from his conduct and the surrounding circumstances." *People v. Manzanares*, 942 P.2d 1235, 1239 (Colo. App. 1996), *abrogated on other grounds by Riley v. People*, 266 P.3d 1089, 1094 (Colo. 2011). And "what the victim saw or heard, and how the victim reacted, are relevant considerations in determining whether

[the] defendant had the requisite intent to place the victim in fear." *Id.*

¶ 23    Considering Rojas' verbal threats, his physical actions, and the deputies' reactions, we conclude that there was sufficient evidence for a reasonable jury to find that Rojas was "aware that his conduct [wa]s practically certain to cause" the deputies to be afraid. § 18-1-501(6); *see Manzanares*, 942 P.2d at 1239.

¶ 24    But Rojas argues that he could not have "knowingly" menaced the deputies because (1) he recanted any threats he may have made, and (2) the tone of the encounter was not threatening. Again, the jury viewed the bodycam footage, weighed the evidence, and reached a different conclusion about Rojas' conflicting statements and the tone of the encounter. *See Sharp*, 104 P.3d at 256. Rojas effectively asks us to reweigh the evidence, which we will not do. *See id.*

¶ 25    Viewing the evidence in the light most favorable to the prosecution, we conclude that the prosecution presented sufficient evidence to establish the "knowingly" element of menacing. § 18-3-206, C.R.S. 2021; *see Clark*, 232 P.3d at 1291.

## 4.    "Use" of a "Deadly Weapon"

¶ 26    Rojas next contends the prosecution failed to present sufficient evidence that he used a deadly weapon. He argues that the hatchet was a tool and that simply holding it did not amount to using a deadly weapon. We are not persuaded.

¶ 27    A deadly weapon includes "[a] knife, bludgeon, or any other weapon, device, [or] instrument . . . whether animate or inanimate, that, in the manner it is used or intended to be used, is capable of producing death or serious bodily injury." § 18-1-901(3)(e)(II), C.R.S. 2021. At the time of Rojas' offense, serious bodily injury was defined as "bodily injury which, either at the time of the actual injury or at a later time, involves a substantial risk of death, a substantial risk of serious permanent disfigurement, a substantial risk of protracted loss or impairment of the function of any part or organ of the body, or breaks, fractures, or burns of the second or third degree." § 18-1-901(3)(p), C.R.S. 2021. In the context of menacing, "use of a deadly weapon" "includes the act of holding a weapon in the presence of another in a manner that is practically certain to cause the other person to fear for [their] safety." *People v. Segura,* 923 P.2d 266, 269 (Colo. App. 1995).

13

¶ 28    Regardless of whether the hatchet was a tool or not, it could be used to cause death or serious bodily injury. And case law makes clear that merely holding a deadly weapon can constitute "use" of that weapon depending on the circumstances. *See id.*; *see also People v. Dist. Ct.*, 926 P.2d 567, 571 (Colo. 1996) ("[T]he phrase 'use of a deadly weapon' is broad enough to include the act of holding a weapon in the presence of another in a manner that causes the other person to fear for his safety, even if the weapon is not pointed at the other person."). Here, Rojas "simply holding" the hatchet at his shoulder — a position from which he easily could have thrown or swung it at the deputies — occurred in the context of him walking toward the deputies and making threatening statements. Rojas did not have to point the hatchet at the deputies or gesture with it to "use" it to menace them. *See Dist. Ct.*, 926 P.2d at 571; *Segura*, 923 P.2d at 269.

¶ 29    Viewing the evidence collectively and in the light most favorable to the prosecution, we conclude that the prosecution presented sufficient evidence to prove that Rojas menaced the deputies "[b]y the use of a deadly weapon." § 18-3-206(1)(a), C.R.S. 2021; *see Clark*, 232 P.3d at 1291.

## III. Jury Instruction

¶ 30    Rojas contends that the district court erred by declining his proposed jury instruction on the definition of "threatened" or "threat." We disagree.

### A. Standard of Review

¶ 31    "We review a trial court's decision whether to give a particular jury instruction for an abuse of discretion." *People v. Cline*, 2022 COA 135, ¶ 32. A court abuses its discretion when its ruling results in a misstatement of the law or is manifestly arbitrary, unreasonable, or unfair. *People in Interest of J.G.*, 2016 CO 39, ¶ 33. We review de novo whether the jury instructions, considered as a whole, correctly state the law. *Id.*; *McDonald v. People*, 2021 CO 64, ¶ 54. So long as the court correctly instructs the jury on the applicable law, it "has broad discretion to determine the form and style of jury instructions." *McDonald*, ¶ 54 (quoting *Day v. Johnson*, 255 P.3d 1064, 1067 (Colo. 2011)).

### B. Additional Background

¶ 32    During the jury instruction conference, defense counsel asked the district court to instruct the jury that "threaten" meant that "the Defendant expressed a purpose or an intent to cause *serious*

15

*bodily injury* to the Officer or the Officer's property." (Emphasis added.) Counsel reasoned that the menacing charges required proof that Rojas placed or attempted to place the deputies in fear of imminent serious bodily injury, so the definition of "threaten" should include reference to serious bodily injury.

¶ 33 The court declined to include "serious bodily injury" in the definition of "threatened" or "threat" and instead instructed the jury that those terms meant "a statement or declaration of purpose or intent to cause injury or harm to the person, property, or rights of another, by the commission of an unlawful act." The court also instructed the jury as to the elements of menacing:

> 1. That Theordore Anthony Rojas II,
>
> 2. in the State of Colorado, at or about the date and place charged,
>
> 3. knowingly,
>
> 4. by any threat or physical action,
>
> 5. placed or attempted to place another person in fear of imminent serious bodily injury.

¶ 34 And the court instructed the jury on the definition of "serious bodily injury" consistent with the statute. *See supra* Part II.B.4 and *infra* Part III.C.

16

## C. The District Court Did Not Err by Denying Rojas' Tendered Instruction

¶ 35 Rojas contends that the district court erred by denying his tendered instruction on the definition of "threatened" or "threat," arguing that the instruction the court gave lowered the prosecution's burden of proof.

¶ 36 To the extent Rojas argues that the court erred by instructing the jury that a "threat" requires an expression of an intent or purpose to cause "bodily injury," we reject that argument because the court gave no such instruction. We acknowledge that the court said during the jury instruction conference that it would instruct the jury that the definition of "threatened" or "threat" "means a statement or declaration of purpose or intent to cause *bodily injury* or harm of the person, property or rights of another by the commission of an unlawful act." (Emphasis added.) But the instruction the court actually gave the jury did not use the term "bodily injury."

¶ 37 To the extent Rojas contends that the court nonetheless should have instructed the jury that a "threat" requires an

expression of intent or purpose to cause "serious bodily injury," we perceive no error.

¶ 38    There is no statutory definition of "threat" for purposes of felony menacing. Nor is there a pattern jury instruction defining the term. But the Colorado Supreme Court has held, in this context, that "[a] threat is a statement of purpose or intent to cause injury or harm to the person, property, or rights of another, by the commission of an unlawful act." *People v. Hines*, 780 P.2d 556, 559 (Colo. 1989).

¶ 39    The district court used the supreme court's definition of "threat" in its jury instruction. It correctly instructed the jury on the elements of felony menacing, including the requirement that Rojas "placed or attempted to place another person in fear of imminent serious bodily injury." *See* COLJI-Crim. 3-2:30 (2022). It instructed the jury on the definition of "serious bodily injury" as defined in the statute. *See* § 18-1-901(3)(p), C.R.S. 2021. And it instructed the jury that "[n]o single instruction describes all the law which must be applied; the instructions must be considered together as a whole."

18

¶ 40    Collectively, these instructions accurately stated the law and required the jury to find beyond a reasonable doubt that Rojas' threats or physical actions knowingly placed or attempted to place the deputies in fear of imminent serious bodily injury.  *See J.G.,* ¶ 33; *McDonald,* ¶ 54.  And we presume the jurors followed these instructions.  *People v. Garcia,* 2012 COA 79, ¶ 20 ("We presume that the jury followed the court's instructions, absent evidence to the contrary.").  We fail to see how the instructions, when read together as they must be, would have allowed the jury to convict Rojas of menacing if it found that his threats and actions placed the deputies in fear of only "bodily injury."  Thus, we conclude that the instructions did not lower the prosecution's burden of proof and that the court did not abuse its discretion by denying Rojas' proposed instruction.  *See McDonald,* ¶ 54.

IV.    Prosecutorial Misconduct

¶ 41    Rojas contends that the district court erred by allowing the prosecutor to commit misconduct during closing argument.  We are not persuaded.

## A. Standard of Review and Applicable Law

¶ 42 We engage in a two-step analysis when reviewing claims of prosecutorial misconduct. *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010). First, we determine whether the prosecutor's conduct was improper based on the totality of the circumstances. *Id.* Second, if the conduct was improper, we decide whether it warrants reversal under the proper standard. *Id.*

¶ 43 We review the trial court's ruling on prosecutorial misconduct for a "gross abuse of discretion resulting in prejudice and a denial of justice." *People v. Camarigg*, 2017 COA 115M, ¶ 39 (quoting *People v. Garner*, 2015 COA 175, ¶ 26). If the defendant objected at trial, we review for harmless error. *People v. Sauser*, 2020 COA 174, ¶ 80. "Under this standard, reversal is required only if the error affects the substantial rights of the parties' by substantially influencing the verdict or affecting the fairness of the trial." *Id.* (quoting *Hagos v. People*, 2012 CO 63, ¶ 12).

¶ 44 While prosecutors can use every legitimate means to bring about a just conviction, they have a duty to avoid using improper methods designed to obtain an unjust result. *Domingo-Gomez v. People*, 125 P.3d 1043, 1048 (Colo. 2005). And prosecutors cannot

misstate or misinterpret the law. *People v. McMinn*, 2013 COA 94, ¶ 62. Still, prosecutors have "wide latitude in the language and style" used to convey their arguments. *Id.* at ¶ 60. And "because arguments delivered in the heat of trial are not always perfectly scripted, reviewing courts accord prosecutors the benefit of the doubt when their remarks are ambiguous or simply inartful." *People v. Samson*, 2012 COA 167, ¶ 30. We evaluate claims of improper argument "in the context of the argument as a whole and in light of the evidence before the jury." *McMinn*, ¶ 60.

### B. "Knowingly"

¶ 45 Rojas contends that the prosecutor committed misconduct during closing argument by misstating the definition of "knowingly." We perceive no reversible error.

¶ 46 As discussed, a person acts "knowingly" when they are aware their conduct is practically certain to cause the result. § 18-1-501(6). During closing argument, the prosecutor told the jury that "knowingly" means

> that [Rojas] is aware that his conduct is practically certain to cause a result and really what this means, ladies and gentlemen, is that his behavior here was not an accident. He did not accidently pick up that tomahawk and put

21

> it on his shoulder, raise it to his shoulder, as
> he walked towards deputies —

Defense counsel objected. The district court overruled the objection, and the prosecutor continued, "[Rojas] did not accidently pick that tomahawk up and raise it to his shoulder when he was placing those deputies in fear of imminent serious bodily injury . . . . He knew what he was doing and he knew that his actions would cause the result of these charges."

¶ 47 Rojas argues that by defining "knowingly" as "not an accident," the prosecutor misstated the law. Even if we assume that is true, we conclude that any error by the court in not sustaining defense counsel's objection was harmless. *See Sauser*, ¶ 80. The prosecutor's inartful statements were fleeting and bookended by accurate statements of the law. And the court instructed the jury on the correct definition of "knowingly." Accordingly, we conclude that any error was harmless because the prosecutor's statements did not substantially influence the verdict or affect the fairness of the trial. *See id.*

## C. "Threat"

¶ 48     Rojas contends that the prosecutor committed misconduct during closing argument by misstating the definition of "threat." We are not persuaded.

¶ 49     During rebuttal closing argument, the prosecutor said,

> [Defense counsel], during her jury selection, she asked you, can holding a weapon, just holding the weapon, constitute a threat and many of the jurors in this panel said yes. Holding a weapon can constitute a threat, because —

Defense counsel objected, arguing that the prosecutor misstated the law and that there was a specific definition for "threat." The court overruled the objection and instructed the jurors that they "simply are to use the instructions and definitions [the court] provided to [them] in writing." The prosecutor continued, "The answer to that was holding a weapon constitutes a threat, because why else would you arm yourself that way?"

¶ 50     Rojas argues that the prosecutor improperly characterized "the mere act of holding a weapon as a threat, absent the additional necessary context of an expression of an intent to harm." But the prosecutor also repeatedly told the jury that a "threat" could be

"verbal threats" or "physical action" or both. The prosecutor argued that Rojas' conduct satisfied the threat element based on "the fact that [Rojas] verbally and physically [made] threats against officers to place them in fear of that serious bodily injury."

¶ 51    Viewed in the context of the entire argument, the prosecutor did not urge the jury to conclude that merely holding the hatchet amounted to a threat. Even if she had, that conclusion is not foreclosed by existing law. *See Denhartog*, ¶ 28. But instead, the prosecutor asked the jury to find a threat based on the combination of Rojas' verbal statements and physical acts. The prosecutor's argument was reasonable based on the evidence. *See People v. Walters*, 148 P.3d 331, 334 (Colo. App. 2006) ("During closing argument, a prosecutor has wide latitude and may refer to the strength and significance of the evidence, conflicting evidence, and reasonable inferences that may be drawn from the evidence."). Accordingly, we conclude that the district court did not grossly abuse its discretion by overruling defense counsel's objection. *See Camarigg*, ¶ 39.

## V. The Court's Statement to the Jury

¶ 52    Finally, Rojas contends that the district court erred by telling the jury that the weapon Rojas used to menace the deputies was a "tomahawk." We are not persuaded.

### A. Standard of Review

¶ 53    Because Rojas did not object to the district court's characterization of the weapon as a tomahawk, we review his contention for plain error. *See Garcia v. People*, 2019 CO 64, ¶ 3. "An error is plain if it is obvious and substantial and so undermines the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction." *People v. Rediger*, 2018 CO 32, ¶ 48. For an error to be obvious, it must contravene a statute, a well-settled legal principle, or established Colorado case law. *Campbell v. People*, 2020 CO 49, ¶ 25.

### B. Additional Background

¶ 54    After closing arguments, the district court read the verdict forms to the jury. The verdict forms for the menacing charges instructed the jury to answer the following interrogatory if it found Rojas guilty of menacing: "Did the Defendant commit Menacing by the use of a firearm, knife, or bludgeon?" After reading the

interrogatory, the court said, "Of course, we're talking about the tomahawk here . . . . "

### C. The District Court Did Not Err by Referring to the Menacing Weapon as a "Tomahawk"

¶ 55    Rojas contends that the district court erred by "endors[ing] the prosecution's description" of the weapon used as a "tomahawk" because "calling the tool a 'tomahawk' imbued it with" the negative associated meanings of the word, including "a potentially deadly weapon of war." Even if we assume the court erred by calling the weapon a tomahawk instead of a hatchet, we conclude that any error was neither obvious nor substantial. *See People v. Morales*, 2014 COA 129, ¶ 38 (plain error must be "both obvious and substantial").

¶ 56    To begin, Rojas cites no statute, rule, or case law that would support his contention that calling the hatchet a tomahawk was error — let alone plain error. *See Campbell*, ¶ 25. Indeed, Rojas does not cite a single legal authority in this section of his opening brief, save for a citation to the plain error standard of review. C.A.R. 28(a)(7)(B) (explaining that the appellant's opening brief must contain "citations to the authorities" on which the appellant relies).

¶ 57 Moreover, the prosecution charged Rojas with felony menacing and specified in the complaint and information that the weapon used was a "tomahawk." The court read the charges, as filed, to the potential jurors before trial began. Throughout trial, the prosecutors, the prosecution witnesses, and defense counsel at times referred to the weapon as a tomahawk. And Rojas does not direct us to any part of the record where he objected to such references.

¶ 58 Under these circumstances, we see no reason why the court would have hesitated to use the word tomahawk when helping the jury associate the verdict forms with the charges. Nor do we see how such a brief reference undermined the fundamental fairness of the trial when the jury had heard the weapon consistently referred to that way throughout trial. *See Rediger*, ¶ 48. Thus, we conclude that any error was not plain.

## VI. Disposition.

¶ 59 We affirm the judgment of conviction.

JUDGE DUNN and JUDGE SCHOCK concur.