2012 COA 167

The PEOPLE of the State of Colorado, Plaintiff–Appellee,

v.

Xavier Aguilera SAMSON, Defendant–Appellant.

No. 10CA2544.

Colorado Court of Appeals, Div. VI.

Oct. 11, 2012.

John W. Suthers, Attorney General, Corelle M. Spettigue, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Douglas K. Wilson, Colorado State Public Defender, Kielly Dunn, Deputy State Public Defender, Denver, Colorado, for Defendant–Appellant.

Opinion by Judge GABRIEL.

¶ 1 Defendant, Xavier Aguilera Samson, appeals his convictions for theft—$1,000–$20,000—series and conspiracy to commit theft—$1,000–$20,000—series. We conclude that the trial court did not abuse its discretion in denying Samson's challenge for cause and perceive no misconduct in the prosecution's closing argument. Accordingly, we affirm Samson's conviction for theft. In addition, as an apparent matter of first impression in Colorado, we conclude that to prove a conspiracy to commit theft—$1,000–$20,000—series, the prosecution is not required to prove that the co-conspirators agreed on the actual value of the items to be stolen. Rather, for purposes of criminal liability, as opposed to sentencing, the prosecution need only prove that the defendant agreed to engage in the conduct constituting the crime of theft. Accordingly, we also affirm Samson's conspiracy conviction.

## I. Background

¶ 2 The prosecution's evidence at trial showed that Samson was or had been roommates with Juan Lopez–Cabello, who, along with Nicolas DelPapa, served as a cashier at Clark's Market, a grocery store in Pitkin County.

¶ 3 On March 7, 2010, Samson visited Clark's and checked out at DelPapa's aisle. DelPapa testified that Samson's appearance at his checkout lane was not unexpected, because Lopez–Cabello had told him that Samson would be coming by the store to get some things. DelPapa understood this to mean that he was to allow Samson to proceed through checkout and take his goods without paying for them. DelPapa proceeded accordingly, and Samson took $820.49 worth of groceries and other goods.

¶ 4 The following day, Samson returned to Clark's and checked out at Lopez–Cabello's aisle. Lopez–Cabello allowed Samson to take $947.43 worth of goods without paying for them.

¶ 5 The People eventually charged Samson with theft—$1,000–$20,000—series and conspiracy to commit theft—$1,000–$20,000—series, and the matter proceeded to trial.

¶ 6 During voir dire, Juror B indicated that he knew a detective endorsed by the prosecution (who ultimately did not testify at trial), as well as other law enforcement officers in the community. He further stated that he trusted these officers and would find it hard to doubt their word if they told him something.

¶ 7 The prosecutor and defense counsel then questioned Juror B extensively about his ability to be fair and to follow the law and the court's instructions. Thereafter, Samson challenged Juror B for cause, but the trial court denied the challenge, finding that (1) the juror indicated that he could render a verdict inconsistent with the testimony of the detective whom he knew; (2) the juror was "confident and direct in his comments that he could in fact follow the law and apply the applicable burden of proof"; and (3) the totality of the juror's voir dire did not support striking him for cause. Samson subsequently used a peremptory challenge to strike

Juror B and exhausted all of his peremptory challenges.

¶ 8 The trial proceeded, and at the conclusion of the prosecution's case, Samson moved for a judgment of acquittal on both charges. The trial court denied that motion.

¶ 9 The jury ultimately convicted Samson as charged, and he now appeals.

## II. Challenge for Cause

¶ 10 Samson first contends that the trial court erred in denying his challenge for cause to Juror B. We are not persuaded.

### A. Standard of Review and Applicable Law

¶ 11 A fair trial is a basic requirement of due process, and the right to challenge a juror for cause is an integral part of a fair trial. *People v. Wilson*, 114 P.3d 19, 21 (Colo.App.2004). To ensure a defendant's right to a fair trial with an impartial jury, a trial court must excuse biased or prejudiced persons from the jury. *Id.* This requirement is codified in section 16–10–103(1)(j), C.R.S. 2012, which requires a court to sustain a challenge for cause when "[t]he existence of a state of mind in the juror evinc[es] enmity or bias toward the defendant or the state." *Accord* Crim. P. 24(b)(1)(X).

¶ 12 Specifically, a trial court must grant a challenge for cause if, among other things, a prospective juror is unwilling or unable to accept the basic principles of criminal law and render a fair and impartial verdict based on the evidence admitted at trial and the court's instructions. *Wilson*, 114 P.3d at 21. Similarly, if the trial court has genuine doubt about the prospective juror's ability to be impartial, it should ordinarily resolve the doubt by sustaining the challenge. *People v. Luman*, 994 P.2d 432, 435 (Colo.App.1999).

Conversely,

no person summoned as a juror shall be disqualified by reason of a previously formed or expressed opinion with reference to the guilt or innocence of the accused, if the court is satisfied, from the examination of the juror or from other evidence, that he will render an impartial verdict according to the law and the evidence submitted to the jury at the trial. § 16–10–103(1)(j); *accord* Crim. P. 24(b)(1)(X).

¶ 13 Applying these principles in appeals involving challenges for cause, divisions of this court have recognized that a juror is not automatically disqualified merely because the juror expresses some doubt as to his or her ability to be impartial. *People v. Arko*, 159 P.3d 713, 722 (Colo.App.2006), *rev'd on other grounds*, 183 P.3d 555 (Colo.2008); *People v. Ward*, 673 P.2d 47, 49 (Colo.App. 1983). Additionally, although a juror's close associations with law enforcement may be indicia of bias, such connections are not alone sufficient to require dismissal for cause. *See People v. Roldan*, —— P.3d ——, ——, 2011 WL 174248 (Colo.App.2011) (*cert. granted* Feb. 13, 2012). Rather, the trial court must consider a combination of factors, evaluating not only such relationships, but also a juror's statements during voir dire and the court's observation and assessment of the demeanor and credibility of that juror. *See id.* at ——.

¶ 14 A commitment to try to put one's biases aside has been deemed sufficient, as long as the juror expresses a belief that he or she can be fair. *People v. Woellhaf*, 87 P.3d 142, 151 (Colo.App.2003), *rev'd on other grounds*, 105 P.3d 209 (Colo.2005). A trial court is entitled to give considerable weight to such assurances. *People v. Sandoval*, 733 P.2d 319, 321 (Colo.1987).

¶ 15 When reviewing a trial court's denial of a challenge for cause, our role is limited. We review the entire voir dire at issue to place the prospective juror's statements in context, and we review the trial court's ruling on a challenge for cause for an abuse of discretion. *People v. Young*, 16 P.3d 821, 824 (Colo.2001). The abuse of discretion standard gives deference to the trial court's credibility assessment of a prospective juror's responses, recognizes the trial court's unique role and perspective in evaluating the demeanor and body language of live witnesses, and serves to discourage an appellate court from "second-guessing those judgments based on a cold record." *Carrillo v. People*, 974 P.2d 478, 486 (Colo.1999).

¶ 16 The erroneous denial of a challenge for cause requires reversal if the defendant excuses the potential juror through a peremptory challenge and exhausts all remaining peremptory challenges. *People v. Macrander*, 828 P.2d 234, 244 (Colo.1992).

## B. Application

¶ 17 Here, Juror B told the court that for sixteen years, he had known a detective who was endorsed as a prosecution witness but who ultimately did not testify. He noted that he knew this detective in both personal and professional contexts, and he also stated that he knew "most of the officers" in the area, was "very close to some of [them]," and had "friendships with a lot of them." Thus, when asked by the court whether he could be fair and impartial, he indicated that he trusted police officers and that "[i]t would be hard to doubt their word."

¶ 18 The prosecutor then questioned Juror B, and Juror B affirmed that he would follow the instructions of the court "to the best of [his] abilities" and that it was his goal to follow the law as instructed. In addition, he responded to the prosecutor as follows:

[PROSECUTOR]: [Juror B], I guess the heart of what I'm asking is will you be able to give the defendant a fair shake when you look at the evidence and not just simply say, "I'm going with law enforcement the whole way no matter what"?

[JUROR B]: I believe so.

[PROSECUTOR]: You're going to hold me to my burden and make me prove this case beyond a reasonable doubt, right?

[JUROR B]: Yes.

[PROSECUTOR]: And you're going to do your best to be fair and impartial and listen to the evidence in its totality and not pick and choose what you think is important and what's not important?

[JUROR B]: Yes.

[PROSECUTOR]: [Y]ou're not going to just throw things out because it doesn't comport with [the detective's] or some other law enforcement's view?

[JUROR B]: That's right.

¶ 19 Defense counsel then questioned Juror B, and Juror B characterized as "fair" defense counsel's assessments that he "kind of start[ed] from the position of I know these guys, I trust these guys" and that he "[did not] think they would tell [him] something that's not true." Nonetheless, he indicated that he believed he could evaluate the detective in the same way he would evaluate other witnesses and that he could try to set aside his prior personal relationships. He further responded:

[DEFENSE COUNSEL]: Would it be fair for me to say you have a serious doubt or a substantial doubt about whether or not you can set aside those personal relationships and view every witness the same and in the same light based just on the testimony and the evidence you hear in this courtroom?

[JUROR B]: I don't know if I'd call it substantial, but there is a doubt there just because of prior relationships.

¶ 20 Based on these statements, the totality of the circumstances, and its observations of Juror B's demeanor and credibility, the court denied Samson's challenge for cause, although it acknowledged that it viewed the challenge as "a close call."

¶ 21 Although, like the trial court, we think the issue was close, we perceive no abuse of discretion in the court's ruling.

¶ 22 To be sure, Juror B's responses reflected some doubt as to his ability to be fair. Such doubt alone, however, does not mandate disqualification for cause, particularly where, as here, Juror B(1) said that he would follow the court's instructions and expressed the belief that he would be able to give Samson "a fair shake"; (2) affirmed without qualification that he would hold the prosecution to its burden of proof; (3) stated that he would evaluate the testimony of the detective whom he knew as he would that of any witness; and (4) confirmed that he would do his best to be fair and impartial and to listen to the evidence in its totality. *See Arko*, 159 P.3d at 722 (affirming the denial of a challenge for cause where, despite a juror's doubt as to her ability to be impartial, she did not think that her experience would prevent her from being fair, and she thought that she could be objective); *Ward*, 673 P.2d at 49 (affirming the

denial of a challenge for cause of a juror who was uncertain as to his ability to remain impartial, where the juror was questioned extensively regarding any biases, the juror revealed no bias toward either party, and he expressed an understanding of the principles on which a fair trial is based).

¶ 23 Nor, as noted above, do Juror B's relationships with law enforcement officers, in and of themselves, mandate disqualification. *See Roldan,* —— P.3d at ——; *see also People v. Vigil,* 718 P.2d 496, 501 (Colo.1986) (holding that the disqualification of a juror was not required, even though the juror's brother was a police officer in a different jurisdiction and the juror testified that he might be inclined to give more weight to the testimony of law enforcement people, where the juror stated that he would be able to follow the court's instructions on credibility and that, if he did so, he could be "fair and impartial to both sides"); *People v. Richardson,* 58 P.3d 1039, 1043 (Colo.App.2002) (holding that the disqualification of a juror was not required even though the juror's brother-in-law was a Denver sheriff, he had friends in law enforcement, he had grown up around police, and he had attempted to gain employment in law enforcement, where the juror acknowledged that law enforcement is not always correct and stated that he would hold the prosecution to its burden of proof and that both sides would get a fair trial from him).

¶ 24 *People v. Roldan,* —— P.3d at ——, and *People v. Prator,* 833 P.2d 819 (Colo.App. 1992), *aff'd,* 856 P.2d 837 (Colo.1993), on which Samson relies, are distinguishable. In *Roldan,* —— P.3d at ——, unlike here, the prospective juror, who had extensive connections to law enforcement, including family relationships, expressly and repeatedly noted her "bias for law enforcement," as well as her awareness of some of the "tricks" that defense attorneys play, and she only equivocally indicated that she could probably be fair and impartial.

¶ 25 Similarly, in *Prator,* 833 P.2d at 821, unlike here, a prospective juror whose son, husband, and father-in-law were all current or former police officers, expressly and repeatedly noted her bias in favor of law enforcement. The juror also testified that she "really" had a doubt in her mind about her ability to set aside her personal feelings, and she stated that she thought she would "end up" being biased. *Id.*

¶ 26 In these circumstances, we cannot say that the trial court abused its discretion in denying Samson's challenge for cause, particularly given the fact that the court carefully considered the testimony and made its decision based on a credibility assessment of the juror's responses.

### III. Prosecutorial Misconduct

¶ 27 Samson next contends that reversal is required because the prosecutor committed misconduct during rebuttal closing argument. We disagree.

### A. Standard of Review and Applicable Law

¶ 28 The determination of whether a prosecutor's statements in closing arguments were improper is generally a matter for the exercise of the trial court's discretion. *People v. Sandoval–Candelaria,* —— P.3d ——, ——, 2011 WL 2186433 (Colo.App.2011) (*cert. granted* Oct. 1, 2012). When, as here, a defendant objected to the prosecution's comments during trial, we review the trial court's ruling under a harmless error standard. *Id.* Under this standard, we must reverse if there is a reasonable probability that the defendant could have been prejudiced by the error. *Id.*

¶ 29 In reviewing a claim of prosecutorial misconduct, we engage in a two-step analysis. *Wend v. People,* 235 P.3d 1089, 1096 (Colo.2010). First, we must determine whether the prosecutor's questionable conduct was improper based on the totality of the circumstances. *Id.* Second, we must consider whether such actions warrant reversal according to the proper standard of review. *Id.* Each of these steps is analytically independent of the other. *Id.*

¶ 30 We must evaluate claims of improper argument in the context of the argument as a whole and in light of the evidence before the jury. *Sandoval–Candelaria,* ——

P.3d at ——. In doing so, we recognize that prosecutors have wide latitude in the language and style they choose to employ, as well as in replying to an argument by opposing counsel. *See People v. Villa,* 240 P.3d 343, 358 (Colo.App.2009); *People v. Vialpando,* 804 P.2d 219, 225 (Colo.App.1990). In addition, because arguments delivered in the heat of trial are not always perfectly scripted, reviewing courts accord prosecutors the benefit of the doubt when their remarks are ambiguous or simply inartful. *People v. McBride,* 228 P.3d 216, 221 (Colo.App.2009).

¶ 31 Prosecutors may comment on the evidence admitted at trial and the reasonable inferences that can be drawn therefrom. *People v. Brown,* —— P.3d ——, ——, 2011 WL 3332314 (Colo.App.2011). They may also employ rhetorical devices and engage in oratorical embellishment and metaphorical nuance. *Id.* And they may comment on the absence of evidence to support a defendant's contentions. *People v. Gibson,* 203 P.3d 571, 577 (Colo.App.2008); *see also People v. Esquivel–Alaniz,* 985 P.2d 22, 23 (Colo.App.1999) (noting that such commentary does not, in and of itself, shift the burden of proof).

¶ 32 Prosecutors, however, may not misstate the evidence, use arguments calculated to inflame the passions and prejudices of the jury, or assert a personal opinion as to the guilt of the defendant or the credibility of witnesses. *Brown,* —— P.3d at ——. Nor may they denigrate defense counsel. *Sandoval–Candelaria,* —— P.3d at ——.

### B. Application

¶ 33 Here, Samson contends that it was improper for the prosecutor (1) to argue that defense counsel had suggested that Samson was "left holding the bag" and was the unwitting victim of others; (2) to argue that Samson's assertion that a reasonable doubt existed, which assertion was based on a purported lack of evidence, was asking the jury to speculate and ignore the evidence and was akin to arguing that the prosecutor had failed to prove that an "alien" did not commit this offense; (3) to argue that Samson was "grasping at straws" in offering alternative arguments; and (4) to ask rhetorically,

"[h]ow many horses can the defendant run?" before concluding, "The defendant is guilty. He did this." We conclude, however, that each of these arguments was a proper response to Samson's arguments.

¶ 34 During Samson's closing argument, defense counsel had specifically argued that Samson had been "left holding the bag" for thefts committed by DelPapa and Lopez–Cabello. Additionally, defense counsel asserted that (1) the prosecution's case was "based on speculation, suspicion, and assumption"; (2) questioned the evidence pointing to a conspiracy among Samson, DelPapa, and Lopez–Cabello; and (3) generally suggested that the prosecution had not met its burden of proving beyond a reasonable doubt that Samson was guilty of the crimes charged.

¶ 35 When viewed in this context, the prosecution's comments on Samson's being an unwitting victim and left holding the bag merely repeated and responded to Samson's argument that he was "left holding the bag" for the thefts by DelPapa and Lopez–Cabello.

¶ 36 Similarly, the prosecution's second argument, that Samson was asking the jury to speculate and did not want the jury to look at the evidence, while rhetorical (particularly in its reference to aliens), did not denigrate defense counsel and was within the realm of fair commentary on Samson's theory of the case. The prosecution did not say or imply, as Samson contends, that the jury was precluded from finding a reasonable doubt based on the lack of evidence.

¶ 37 In addition, the prosecution's argument that Samson was "grasping at straws" and its question as to how many "horses" Samson could run were fair comments on Samson's various alternative theories of the case.

¶ 38 And the prosecution's assertion that Samson was guilty, which was not preceded by a phrase like "I believe," amounted to a statement that the evidence established Samson's guilt, and not an improper statement of the prosecutor's personal opinion as to such guilt. *See Villa,* 240 P.3d at 358 (construing

a prosecutor's statement asking the jury to find the defendant guilty "because he [was] guilty" as a statement asking the jury to make a reasonable inference that the defendant was guilty based on the evidence presented at trial).

¶ 39 In light of the foregoing, we perceive no prosecutorial misconduct in the challenged statements, much less misconduct warranting reversal.

## IV. Sufficiency of the Evidence of Conspiracy

¶ 40 Finally, Samson contends that the evidence was insufficient to support his conspiracy conviction because the prosecution was required to prove not only that he agreed to take the groceries from Clark's Market, but also that this agreement extended to the fact that those groceries were valued at between $1,000 and $20,000. Because we reject Samson's premise that the prosecution was required to prove an agreement as to the value of the goods to be taken, we are not persuaded.

### A. Standard of Review and Applicable Law

¶ 41 We review de novo whether sufficient evidence supports a conviction. *Dempsey v. People*, 117 P.3d 800, 807 (Colo.2005). When assessing the sufficiency of the evidence supporting a conviction, we determine whether the evidence, viewed as a whole and in the light most favorable to the prosecution, is sufficient to support a rational conclusion that the defendant is guilty of the offense beyond a reasonable doubt. *See People v. Sprouse*, 983 P.2d 771, 777 (Colo.1999).

¶ 42 Where a sufficiency of the evidence argument turns on a question of statutory interpretation, we endeavor to effectuate the intent of the General Assembly, which is charged with defining criminal conduct and establishing the legal elements of a crime. *People v. Randell*, 2012 COA 108, ¶ 32, 297 P.3d 989. We begin with the plain language of the statute, reading the words and phrases in context and construing them according to their common usage. *Id.* If the statutory language is clear and unambiguous, we apply it as written without resort to further rules of statutory analysis. *Id.*

### B. Conspiracy to Commit Theft

¶ 43 Section 18–2–201(1), C.R.S.2012, provides, in pertinent part:

A person commits conspiracy to commit a crime if, with the intent to promote or facilitate its commission, he agrees with another person or persons that they, or one or more of them, will engage in conduct which constitutes a crime or an attempt to commit a crime. . . .

¶ 44 Accordingly, the crime of conspiracy requires two mental states: (1) the defendant must possess the specific intent to agree to commit a particular crime, and (2) he or she must possess the specific intent to cause the result of the crime that is the subject of the agreement. *Palmer v. People*, 964 P.2d 524, 527 (Colo.1998).

¶ 45 Here Samson was charged with conspiracy to commit theft—$1,000–$20,000—series. Specifically, as pertinent here, the information alleged:

XAVIER AGUILERA SAMSON, with the intent to promote or facilitate the commission of the crime of theft, unlawfully and feloniously agreed with Nicolas Delpapa, [sic] and Juan Lopez–Cabello . . . that one or more of them would engage in conduct which constituted that crime . . . , and an overt act in pursuance of the conspiracy was committed by one or more of the conspirators . . . , and thereby did commit the crime of CONSPIRACY TO COMMIT THEFT—$1,000–$20,000—SERIES (F5).

¶ 46 The question presented here is whether the prosecution was required to prove that Samson agreed with DelPapa and Lopez–Cabello to take goods valued at between $1,000 and $20,000, or whether, for purposes of this case, it was sufficient for the prosecution to prove an agreement to commit theft, and, independently for purposes of sentencing, the fact that the value of the goods taken was between $1,000 and $20,000. This question, in turn, depends on what conduct constitutes the "crime" of theft under section 18–4–401, C.R.S.2012.

¶ 47 As pertinent here, a person commits theft

> when he knowingly obtains or exercises control over anything of value of another without authorization ... and ... [i]ntends to deprive the other person permanently of the use or benefit of the thing of value.

§ 18–4–401(1)(a), C.R.S.2012.

¶ 48 In *Roberts v. People*, 203 P.3d 513, 518 (Colo.2009), our supreme court explained:

> An offense of theft is complete and may be separately prosecuted when one knowingly controls the property of another without that person's authorization and either has an intent at that moment to permanently deprive the other person of its use or treats the property in a manner that he intends to, or at least knows will, permanently deprive the other person of it. Precisely when those conditions have been met will, of course, differ with the circumstances of each case, but when a properly informed trier of fact determines that they occur with regard to any particular thing of value, a crime of theft is committed.

¶ 49 Accordingly, to establish the crime of theft under section 18–4–401(1)(a), the prosecution need only prove that the defendant knowingly obtained or exercised control over anything of value of another without authorization and with the intent to deprive the victim permanently of its use or benefit. *Id.* at 516; *see also People v. Jamison*, 220 P.3d 992, 994 (Colo.App.2009) (noting that when there is no evidence presented as to *any* value amount for the items at issue, there is insufficient evidence to establish value for purposes of the theft statute); *cf. People v. Moore*, 226 P.3d 1076, 1085–86 (Colo.App. 2009) (holding that there was insufficient evidence to prove that the value of the stolen items received by the defendant was $15,000 or more, where the ·vast majority of the valuation testimony was based on speculation, guesses, assumptions, purchase prices many years old, and evidence not admitted at trial; the division thus vacated the judgment on the class 3 felony and remanded for entry of judgment on a class 4 felony, which was supported by the evidence).

¶ 50 The prosecution, however, need not prove the precise value of the thing taken to establish the theft, although it must plead and prove that value to determine the theft's classification level. *See Jamison*, 220 P.3d at 995 ("[T]he value of property taken is, strictly speaking, a sentence enhancer rather than an element of the crime of theft...."); *see also Roberts*, 203 P.3d at 516 (observing that the categorization of theft as either a misdemeanor or a particular class of felony depends on the value of the thing involved); *Armintrout v. People*, 864 P.2d 576, 580 (Colo.1993) ("[A] sentence enhancement provision is not an element of the offense charged."); *cf. People v. Suazo*, 867 P.2d 161, 170 (Colo.App.1993) (noting in dicta that, in a theft case, "the jury is not required to find that the defendant had any level of awareness of the actual value of the stolen items").

¶ 51 Because the completed crime of theft does not require proof of a defendant's knowledge of the value of the goods taken, it follows that a conspiracy to commit theft does not require the prosecutor to prove an agreement to take goods valued at a particular amount of money. Specifically, as noted above, a defendant is guilty of conspiracy to a commit a crime if, among other things, he or she agreed with another to engage in conduct that constitutes that crime. § 18–2–201. Because stealing groceries, irrespective of the defendant's knowledge of their value, constitutes theft (as long as the groceries have *some* established value), an agreement to steal groceries, irrespective of their established value, constitutes a conspiracy under section 18–2–201(1). *Cf. People v. McKinney*, 99 P.3d 1038, 1042 & n. 5 (Colo.2004) (after noting that the statute providing a sentencing enhancer for thefts committed against at-risk adults does not list the elements that constitute the commission of theft against such victims but rather refers back to the general theft statute, the court stated that its analysis would also logically apply to conspiracy to commit such an offense).

¶ 52 Although no Colorado appellate court appears to have addressed this issue directly, and the parties have pointed to no cases on point, we note that our supreme court and various divisions of this court have upheld convictions for conspiracy to commit theft without discussing whether the agreement

extended to the value of the items involved. *See, e.g., People v. Lamirato,* 180 Colo. 250, 254–55, 504 P.2d 661, 663–64 (1972) (concluding that the evidence was sufficient to support a conviction for conspiracy to commit theft where the evidence showed that the defendant told another party that he would take all of the color television sets that the other party could steal, but without addressing whether there was an agreement regarding the value of those television sets); *People v. Pappadiakis,* 705 P.2d 983, 986–87 (Colo. App.1985) (concluding that the evidence was sufficient to support the defendant's conviction of conspiracy to commit theft over $10,000 without addressing any agreement among the co-conspirators as to the value of the items to be taken), *aff'd sub nom. Peltz v. People,* 728 P.2d 1271 (Colo.1986).

¶ 53 Our conclusion is also consistent with those federal court decisions holding that a conspiracy to commit a drug offense does not require proof of an agreement as to the particular quantity of drugs involved, notwithstanding the fact that the quantity of drugs involved is an important factor in sentencing. *See, e.g., United States v. Portorreal,* 413 Fed.Appx. 314, 315 (1st Cir.2011) (noting that the quantity of drugs is not an element of conspiracy under the applicable federal statute, nor is it an element of the underlying controlled substances offense; rather, it is a sentencing factor); *United States v. Gonzalez–Velez,* 466 F.3d 27, 35 (1st Cir.2006) (same).

¶ 54 And we note that at trial, Samson implicitly agreed with our interpretation of the conspiracy statute. Specifically, during its deliberations, the jury sent a note asking, "In a conspiracy do you aggregate the dollar amount in two separate conspiracies to reach the $1,000–$20,000 as a series of conspiracies? If there was a different conspiracy on each day do you add them together for the total dollar amount?"

¶ 55 The court proposed to respond, "If you conclude a single conspiracy led to thefts on both March 7 and March 8, 2010, you should add together the amounts for the two days. If you conclude there was a different conspiracy for each day, you should not add together the amounts for each of the days."

Defense counsel replied, "I'm okay with that language," although he asked the court to reverse the order of the sentences, which the court declined to do.

¶ 56 The trial court's response to the jury's question reflected its understanding that the prosecution was only required to prove an agreement to commit the thefts, not an agreement as to the amount to be taken, which is consistent with our holding today. And notwithstanding the position that he now takes on appeal, Samson, through counsel, agreed with the trial court's interpretation and thus acquiesced in the court's response to the jury to that effect.

¶ 57 *Bates v. People,* 179 Colo. 81, 498 P.2d 1136 (1972), on which Samson relies, is inapposite. In *Bates,* 179 Colo. at 85, 498 P.2d at 1138, our supreme court reversed a conviction for conspiracy to commit the malicious and felonious destruction of personal property valued at over $500. There, however, the prosecution had failed to produce sufficient evidence that there was *any* agreement to damage or destroy personal property, much less an agreement as to the value of property to be destroyed. *Id.* at 85, 498 P.2d at 1138.

¶ 58 Accordingly, we conclude that the prosecution was not required to prove that Samson agreed with Lopez–Cabello and Del-Papa to steal groceries valued at $1,000–$20,000. Rather, for purposes of establishing the charged conspiracy, it was required to prove only that these men agreed to commit the theft, although, for purposes of classifying the level of the crime, the prosecution was required to plead and prove the amount beyond a reasonable doubt. *See Jamison,* 220 P.3d at 995 (noting that sentence enhancers, like elements of a crime, must be pleaded, proved, and found beyond a reasonable doubt by a jury).

¶ 59 The question thus remains as to whether the prosecution satisfied this burden of proof. We conclude that it did.

¶ 60 Specifically, the evidence showed that Lopez–Cabello advised DelPapa that Samson would be coming to the store and that DelPapa understood that he was to help Samson steal groceries. The evidence further showed that Samson appeared at Clark's on

two consecutive days, stealing $820.49 worth of goods with DelPapa's help on the first day and $947.43 worth of goods with Lopez-Cabello's help on the second day. This evidence amply supports a reasonable inference that Samson had agreed with both Lopez-Cabello and DelPapa to steal groceries and other goods from Clark's Market. Moreover, it is undisputed that the aggregate value of the goods taken was between $1,000 and $20,000.

¶ 61 Accordingly, we conclude that the evidence was sufficient to support Samson's conspiracy conviction.

### V. Conclusion

¶ 62 For these reasons, the judgment is affirmed.

Judge PLANK * and Judge NIETO *, concur.