23CA1347 Peo v Kalan 06-25-2026

COLORADO COURT OF APPEALS

_____

Court of Appeals No. 23CA1347
Jefferson County District Court No. 21CR3150
Honorable Robert Lochary, Judge

_____

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Sarah Anne Kalan,

Defendant-Appellant.

_____

JUDGMENT AFFIRMED

Division V
Opinion by JUDGE LIPINSKY
Yun and Schutz, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced June 25, 2026

_____

Philip J. Weiser, Attorney General, Majid Yazdi, Senior Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Chelsea E. Mowrer, Deputy
State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    Sarah Anne Kalan appeals her convictions for second degree murder, menacing, and second degree aggravated motor vehicle theft.  We affirm.

## I.    Background

¶ 2    A jury could have reasonably found the following facts from the evidence introduced at trial.

¶ 3    Kalan lived with Wayne Nichols in his trailer.  Tracy Ahee, a friend of Kalan, was also staying there when, late on November 27, 2021, Kalan and Nichols began arguing about moving the trailer and Kalan's use of Nichols's truck.

¶ 4    The argument escalated, resulting in Kalan fatally shooting Nichols.  Ahee witnessed the shooting.

¶ 5    Ahee offered multiple accounts of the events leading to the shooting.  In a recorded interview with police played for the jury, she recounted that, after Nichols told Kalan to "[s]hut the fuck up," Kalan became angry and struck him with a pot multiple times. Nichols tried to protect himself with his hands and asked, "What are you doing?  What is wrong with you?"

¶ 6    According to Ahee, Kalan picked up a gun, cocked it, and pointed it at Nichols.  After setting the gun down, Kalan grabbed the

1

pot and continued striking Nichols with it. Ahee said that Kalan picked up the gun again and told Ahee, "Close your eyes, bitch." After shooting Nichols in the leg, Kalan told him, "You're just gonna sit there and bleed to death," and she warned Ahee, "You're gonna be next because you're a witness."

¶ 7 Ahee also said that she believed Kalan had been plotting against Nichols, though she offered no specifics. After the shooting, Ahee left the trailer. Kalan loaded belongings into Nichols's truck and drove off.

¶ 8 At trial, Ahee testified that the argument between Kalan and Nichols became physical, with both "throwing punches at each other." She said, "[T]hey were both being physical, and they were both being aggressive towards each other." Ahee asserted that Kalan "decided to scare" Nichols by pointing a gun at him.

¶ 9 The bullet struck Nichols in the right leg near the groin, severing the femoral artery, "the major blood vessel supplying blood to the leg," and causing him to bleed to death. He also sustained injuries to his scalp, upper lip, left arm, left forearm, and left wrist.

¶ 10 Kalan was charged with first degree murder (after deliberation), felony menacing, possession of a weapon by a

2

previous offender, second degree aggravated motor vehicle theft, and two crime of violence enhancement counts.

¶ 11    Kalan did not testify at trial.  Defense counsel argued that Kalan pointed the gun at Nichols only to scare him and that it discharged accidentally.  The trial court gave the jury a general self-defense instruction.

¶ 12    The jury convicted Kalan of second degree murder, menacing, and second degree aggravated motor vehicle theft.  The trial court sentenced her to forty-five years in the custody of the Department of Corrections.

¶ 13    On appeal, Kalan contends that the trial court (1) violated *Batson v. Kentucky*, 476 U.S. 79 (1986), by permitting the prosecutor to use a peremptory challenge to strike a prospective juror based on her race; (2) erred by refusing to instruct the jury on the use of nondeadly force in self-defense; and (3) improperly allowed prosecutorial misconduct during closing argument.  Kalan also argues that we should reverse her conviction under the doctrine of cumulative error.  We affirm the judgment of conviction.

## II.  Analysis

### A.  The Trial Court Properly Denied Kalan's *Batson* Challenge

#### 1.  Standard of Review

¶ 14    "*Batson* outlines a three-step process for evaluating claims of racial discrimination in jury selection under the Equal Protection Clause." *People v. Cerrone*, 854 P.2d 178, 185 (Colo. 1993).  "On appeal, each step of the trial court's *Batson* analysis is subject to a separate standard of review." *People v. Rodriguez*, 2015 CO 55, ¶ 13, 351 P.3d 423, 429.

¶ 15    We "review de novo a trial court's conclusions regarding whether the objecting party established a prima facie case at step one and whether the striking party has articulated a race-neutral reason at step two." *People v. Johnson*, 2024 CO 35, ¶ 21, 549 P.3d 985, 991.  But we "review the trial court's ultimate step-three conclusion, regarding 'whether the objecting party proved purposeful discrimination by a preponderance of the evidence,' for clear error." *Id.* (quoting *People v. Beauvais*, 2017 CO 34, ¶ 2, 393 P.3d 509, 512).  Under that standard, we "defer to the trial court's ruling 'so long as the record reflects that the trial court weighed all of the pertinent circumstances.'" *Id.* (quoting *Beauvais*, ¶ 2, 393

P.3d at 512). "Given this deferential standard, reversal is only proper under 'exceptional circumstances.'" *Beauvais*, ¶ 22, 393 P.3d at 517 (quoting *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008)).

## 2.    Additional Facts

¶ 16    During voir dire, CDC, one of the prospective jurors, said, "I have four kids, two working for the state and one for the phone company.  One is unemployed right now.  I'm a proud grandma of a police officer, and is soon to be a fire guy. . . .  I'm married, and my husband is retired . . . ."

¶ 17    In response to the court's question regarding whether "serving on a trial in this case for six days would be a hardship such that you don't think you could serve," CDC explained:

> [CDC]: My husband [unintelligible] bypass surgery.  He's at home right now, and last night it's a little swollen, so we have to call the doctor and see what's going on.
>
> THE COURT: Okay.  Can you check in on him during the break?  We're going to take our break right after this.
>
> [CDC]: Yes, I can.
>
> THE COURT: Okay.  Thank you.

¶ 18    Another prospective juror — F — also reported illness in her family. She explained that her twenty-month-old twins were sick, she was a stay-at-home mother, and her husband was an attorney. When the court inquired about hardships, F said that her mother had planned to watch the twins that morning but had fallen ill, so her husband was staying home with them, despite being behind at work, and she had no child care for the upcoming week. When asked if her husband could take additional time off if she served on the jury, F answered that she "assum[ed] he c[ould]."

¶ 19    The prosecutor then explored how jurors assess a person's mental state by offering a hypothetical about someone brushing past her at a Starbucks and spilling her coffee. The prosecutor asked, "How do we know whether that was on purpose or not on purpose?" After another prospective juror suggested considering whether the person "apologized" and "seemed remorseful," the prosecutor and CDC engaged in the following colloquy:

> [PROSECUTOR]: . . . . So in that hypothetical, how do you know if someone hit the coffee out of my hand on purpose or if it was accidental?
>
> . . . .

[CDC]: Okay. Well, if that person [is] going to push hard and they didn't say I'm sorry, I guess it was on purpose.

[PROSECUTOR]: Okay. So you think that maybe how hard I was hit might come into play?

[CDC]: Well, not — probably not that hard, but they push you, like, okay. I don't know.

[PROSECUTOR]: Okay.

[CDC]: *I'm not good explaining stuff.*

[PROSECUTOR]: Okay. Well, what else do you look for in terms of determining what intent is?

[CDC]: Some people, especially when our age, we don't — we're kind of clumsy, and I think we get — I don't know, we get pass [sic] without looking what's around us, and — but if that happens, if that happens, we say I'm sorry. But it's people that is really rude, and, yeah, and they can pass by you and push you, and not hard but hard enough to spill your coffee.

[PROSECUTOR]: Okay. And because you brought it up this morning, how is your husband?

[CDC]: It's a little swollen on the right side, which it was the blockage, so we have to call the doctor. And I took some pictures last night to see the difference, so —

[PROSECUTOR]: Were you able to call the doctor over the break?

[CDC]: No.  No.  Because the papers are at home.  And he's sore.

[PROSECUTOR]: Okay.

[CDC]: But thank you to remember.

(Emphasis added.)

¶ 20     Defense counsel then asked the entire panel, "Do you feel like in a case that involves a homicide, the death of somebody, that the prosecution should have to prove just a little less than they would, say, in a forgery or a drug case because somebody lost their life? Should they prove less?"  One prospective juror responded no, saying, "They still have to prove the same amount of beyond a reasonable doubt."  Defense counsel then asked CDC for her view:

> [DEFENSE COUNSEL]: [CDC], what do you think?
>
> [CDC]: I agree with her.
>
> [DEFENSE COUNSEL]: Okay.  I want to ask you a question about your husband.  Were you able to talk with him?
>
> [CDC]: Yes.
>
> [DEFENSE COUNSEL]: Okay.  And are things okay?
>
> [CDC]: Well, he was trying to call the doctor and see if he needs to go back.

[DEFENSE COUNSEL]: Okay. So he's capable physically of making that call —

[CDC]: Yes.

[DEFENSE COUNSEL]: — and getting himself there?

[CDC]: No.

[DEFENSE COUNSEL]: No?

[CDC]: No, he's not able to drive.

[DEFENSE COUNSEL]: Is there somebody besides yourself who can drive him, if necessary?

[CDC]: Not really. My boys, they are working.

[DEFENSE COUNSEL]: Okay. Could he take an Uber?

[CDC]: I don't know.

[DEFENSE COUNSEL]: Okay.

[CDC]: But thank you.

¶ 21    Following voir dire, the prosecutor exercised a peremptory strike to remove CDC but did not strike F from the panel. Defense counsel then made a *Batson* objection, leading to the following exchange:

[DEFENSE COUNSEL]: . . . . [CDC] is a Hispanic lady. We only have two Hispanics on our jury. . . .

9

THE COURT: Okay. And have you raised your inference of racial motivation?

[DEFENSE COUNSEL]: I guess I should give you a little bit more record. Because she is only one of the two, she did not provide very much information during jury selection, but the information that she provided mostly had to do with the state of health affairs for her husband. Ultimately what she provided is that her husband is able to take care of himself in terms of calling the doctor. She wasn't sure about transportation, but she didn't indicate that was any sort of an issue. Outside of that, there wasn't a lot of discussion by the People or myself with her.

THE COURT: Thank you. I think that raises it.

And over to the prosecution to articulate a race neutral reason for excluding.

[PROSECUTOR]: Your Honor, she indicated that her husband had recent open heart surgery and that last night, it looked like it was getting swollen. She took a picture of it last night and was comparing it to the status of the wound today. She was not able to touch base with her husband over the first break, and over the lunch break indicated he still wasn't feeling well and wanted to get in touch with the doctor. She indicated there was no one else to transport him, and that she would need to do so. And so for that reason, that is it. Additionally, Your Honor, the People did question her with respect to the People's initial hypothetical regarding intent. She had difficulty articulating what she thought intent was, what she would be able to look at. She

10

wasn't really able to give my [sic] any answers, and that is an additional consideration.

THE COURT: All right. The Court will find that the People have offered a few race neutral reasons for excluding her from jury service, particularly the husband having — I think he had bypass surgery last night. He's swollen, she said, and she hasn't been able to contact him, and it appears he's home alone. So I'll switch it back over to the defense for an opportunity to rebut that explanation.

[DEFENSE COUNSEL]: I'll address that and what [the prosecutor] said for completeness of the record. In terms of her responses, she was responsive. She gave examples based on the spilling of coffee. She said that people who are older can be clumsy, that she would be looking at that, she would be looking at whether somebody said sorry, because generally saying sorry will — happens when it's an accident.

Yes, she did indicate that her husband is home alone. She also told us in initial voir dire she has four children. She — there's not been an indication that she is needed there to care for him. She has certainly not pressed the issue with this Court today. And, Your Honor, I think if we look at her compared to [F], she is an individual that has children, children who are sick children, and the People have not made an effort at this point to have her dismissed. I don't have anything further.

THE COURT: Okay. So the Court has to examine whether, by preponderance of the evidence, there was purposeful discrimination here. Under recent U.S. Supreme Court precedent, the resolution of the question turns

on the application of the substantial motivating factor test. A peremptory strike is purposefully discriminatory under Step 3 if the strike is motivated in substantial part by discriminatory intent.

The Court here, in evaluating the reasons that the prosecutor gave, does not find that . . . they were implausible pretexts for purposeful discrimination. The Court also has to evaluate the proponent's credibility and plausibility of her explanation. The Court doesn't find that this is a pretextual strike, especially in light of — and I agree, Counsel, I think what you said about — I think the answers to her questions were fine, but her husband having bypass surgery, he's alone today, and he just had the surgery last night, and she's obviously concerned about him, and no one else is there, I think that those are race neutral reasons for the strike. And so the Court will deny the motion under *Batson.*

### 3. Kalan Did Not Establish that the Prosecutor's Strike of CDC Was Substantially Motivated by Discriminatory Intent

¶ 22 Kalan contends that the prosecutor's use of a peremptory challenge to strike CDC was substantially motivated by discriminatory intent for five reasons:

(1) F, "a non-Hispanic individual who served on the jury, was similarly experiencing health issues with her twin twenty-month-year [sic] olds";

12

(2) "from CDC's voir dire, it appear[ed] she would have been a good juror for the prosecution";

(3) "the prosecutor never sought to get a definitive answer from CDC about potential alternative transportation in the event [her husband] had to see the doctor";

(4) because the court did not credit the prosecutor's argument that she struck CDC based on CDC's answers to the prosecutor's questions about intent, the court necessarily found that the prosecutor misrepresented the record, which "points to a discriminatory intent"; and

(5) because "the court didn't credit the intent hypothetical reason" for the strike, "half of the reasons [for striking CDC] given by the prosecution" were pretextual "and this evidences purposeful discrimination."

We disagree.

¶ 23    "At *Batson*'s first step, 'the objecting party must make a prima facie showing that the striking party exercised a peremptory challenge based on race or gender.'" *Johnson*, ¶ 18, 549 P.3d at 990-91 (quoting *People v. Owens*, 2024 CO 10, ¶ 76, 544 P.3d 1202, 1222).  "The standard for doing so isn't high and requires the

13

objecting party to present evidence sufficient to raise only an inference of discrimination rather than proof by a preponderance of the evidence that discrimination occurred." *Id.* at ¶ 18, 549 P.3d at 991.

¶ 24 "At step two, the prosecutor must come forward with a race-neutral explanation 'related to the particular case to be tried.'" *Rodriguez,* ¶ 11, 351 P.3d at 429 (quoting *Batson,* 476 U.S. at 98). "At step three, after the defendant has a chance to rebut the prosecutor's race-neutral explanation, the trial court must decide the ultimate question: whether the defendant has established purposeful discrimination." *Id.* at ¶ 12, 351 P.3d at 429. "A trial court must presume initially that a prosecutor has exercised peremptory challenges on constitutionally permissible grounds . . . ." *People v. Morales,* 2014 COA 129, ¶ 19, 356 P.3d 972, 978.

¶ 25 We address each of the five prongs of Kalan's argument in turn.

¶ 26 First, the record does not support Kalan's claim that F and CDC faced similar hardships if selected to serve on the jury. When the court asked F whether her husband could "take time off" to care

for their sick twenty-month-old twins, she said that she could serve on the jury if selected. F added, "I mean, I'm assuming [my husband] can. I mean, he's an attorney, so I think they would have to understand . . . ." The court remarked, "I think they of all people would understand, because without you, we can't do this, and the system wouldn't work."

¶ 27 When responding to the prosecutor's argument that CDC was struck for a race-neutral reason, defense counsel did not acknowledge that CDC said that no one besides herself could drive her husband, that CDC said she did not know whether her husband could take an Uber, or that F said her husband could stay home with the children during the trial:

> Yes, [CDC] did indicate that her husband is home alone. She also told us in initial voir dire she has four children. She — there's not been an indication that she is needed there to care for him. She has certainly not pressed the issue with this Court today. And, Your Honor, I think if we look at her compared to [F], she is an individual that has children, children who are sick children, and the People have not made an effort at this point to have her dismissed.

¶ 28 We agree with the trial court that F was not similarly situated to CDC. F's husband was apparently able to care for the couple's

15

ailing children during the trial, while CDC said she was the only one able to drive her husband to the doctor if he continued to experience post-operative complications. *See Beauvais*, ¶¶ 56-57, 393 P.3d at 524 (For purposes of deciding a *Batson* challenge, "an empaneled juror is similarly situated to a dismissed potential juror . . . if the empaneled juror shares the same characteristics for which the striking party dismissed the potential juror," but "[i]solated similarities do not automatically render two jurors 'similarly situated.'").

¶ 29    Second, Kalan's contention that the prosecutor's use of a peremptory challenge to strike CDC showed purposeful discrimination because "she would have been a good juror for the prosecution" lacks record support. In *Miller-El v. Dretke*, the United States Supreme Court concluded that the subject juror — a Black man who "unequivocally stated that he could impose the death penalty regardless of the possibility of rehabilitation," 545 U.S. 231, 244 (2005) — "should have been an ideal juror in the eyes of a prosecutor seeking a death sentence," *id.* at 247. In contrast, the record does not show that CDC was a "good" or "ideal" juror for the prosecution. *Id.* Kalan points to no statement from CDC that

sheds light on her views on the criminal justice system or willingness to convict. Her description of herself as "a proud grandma of a police officer" and soon-to-be "fire guy" did not, by itself, make her favorable to the prosecution.

¶ 30 Third, we are not persuaded by Kalan's argument that the prosecutor's race-neutral reason for striking CDC was pretextual because the prosecutor "never sought to get a definitive answer from CDC about potential alternative transportation." CDC said that her husband was unable to drive, no one else was available to take him to the doctor, and she did not know whether he could use an Uber. Kalan does not clarify what would have qualified as a "definitive answer" or what additional steps the prosecutor should have taken to obtain one. The prosecutor was not required to ask CDC about every possible means of transportation in metro Denver — public buses, light rail, taxis, Lyft, scooters, ambulances, and the like. Further, during the colloquy regarding the defense's *Batson* challenge, defense counsel never contended that CDC's responses about her husband's transportation challenges were inadequate or less than "definitive."

¶ 31     Accordingly, the trial court did not err by finding that the prosecutor struck CDC for a race-neutral reason because CDC "indicated there was no one else to transport [her husband], and that she would need to do so."

¶ 32     Fourth, we disagree with Kalan's assertion that the trial court's rejection of the prosecutor's alternative reason for striking CDC — her struggle to articulate her thoughts — shows that the prosecutor "misrepresent[ed]" the record or purposefully discriminated against CDC.  CDC's admission that she was "not good [at] explaining stuff" supported the prosecutor's reasoning. The trial court's brief remark that CDC's "answers to her questions were fine" does not amount to a finding that the prosecutor misrepresented the record or offered a pretextual justification for the strike.

¶ 33     Fifth, Kalan's *Batson* argument fails to the extent it relies on a "per se approach," which the supreme court rejected in *Johnson.* *See Johnson,* ¶¶ 57-58, 549 P.3d at 997-98 (holding "that, in resolving the question of purposeful discrimination at step three, the trial court should use a substantial-motivating-factor approach," and rejecting "a per se approach" under which "a court

must sustain a *Batson* challenge when the striking party gives both race-based and race-neutral reasons to support the strike").

¶ 34    Thus, under the deferential standard of review for step-three *Batson* determinations, *Beauvais,* ¶ 22, 393 P.3d at 517, we affirm the trial court's conclusion that Kalan did not prove "by a preponderance of the evidence that discriminatory animus drove the [prosecutor's] use of [the] peremptory challenge[]" to CDC, *id.* at ¶ 32, 393 P.3d at 519.

### B.    The Trial Court Did Not Err by Declining to Give the Jury a Nondeadly Force Self-Defense Instruction

#### 1.    Standard of Review

¶ 35    "[T]o present an affirmative defense for the jury to consider, a defendant must offer 'some credible evidence' to support the claimed defense." *Pearson v. People,* 2022 CO 4, ¶ 16, 502 P.3d 1003, 1007 (quoting § 18-1-407(1), C.R.S. 2025).

¶ 36    We review de novo whether there is "sufficient evidence in the record to support a self-defense jury instruction." *People v. Coahran,* 2019 COA 6, ¶ 15, 436 P.3d 617, 621.  "When considering an affirmative defense instruction, we consider the evidence in the

light most favorable to the defendant." *Id.* (quoting *People v. Newell*, 2017 COA 27, ¶ 19, 395 P.3d 1203, 1207).

### 2. Additional Facts

¶ 37    At the jury instruction conference, defense counsel argued that, because "the facts . . . indicate[d] that there was no intent to use deadly physical force, only an intent to use physical force," Kalan was entitled to a nondeadly force self-defense instruction. Defense counsel asserted that

> [h]ere what we have is a single gunshot wound to the leg. Typically, most people don't have knowledge about the locations of various arteries in the body. There's no indication that [Kalan], via the testimony, said anything in advance of the shooting itself that she intended to kill [Nichols]. The wound itself seems to indicate that she did not.

¶ 38    Citing *People v. Opana*, 2017 CO 56, ¶¶ 3-17, 395 P.3d 757, 758-62, in which the defendant admitted he shot the victim in the chest, and observing that "there's evidence that [Kalan] . . . said bleed out and die, that the door was locked [when Kalan left], and . . . that [Kalan] had to go through [steps] to fire th[e] gun," the court concluded, "I don't think I can give a general self-defense instruction. I think it has to be a use of deadly physical force

20

instruction, given the facts and circumstances here and the holding in *Opana.* So that's what I will rule."

¶ 39 Later that day, the court gave the jury the general self-defense instruction that the defense had tendered. That instruction provided, in relevant part:

> The evidence presented in this case has raised the affirmative defense of "Defense Of Person" as a defense to 1st Degree Murder and 2nd Degree Murder.
>
> The defendant was legally authorized to use *physical force* upon another person without first retreating if:
>
> 1. She used that *physical force* in order to defend herself or a third person from what she reasonably believed to be the use or imminent use of unlawful physical force by that other person, and
>
> 2. She used a degree of force which she reasonably believed to be necessary for that purpose, and
>
> 3. She had a reasonable ground to believe, and did believe, that she or another person was in imminent danger of being killed or of receiving great bodily injury . . . .

(Emphases added.)

### 3. The Self-Defense Instruction Did Not Lower the Prosecution's Burden of Proof

¶ 40    Kalan contends that, "[b]ecause the district court didn't instruct the jury on the affirmative defense of use of non-deadly force in self-defense, the prosecution didn't bear the burden of disproving it," which "impermissibly lowered" the prosecution's burden of proof. We disagree.

¶ 41    "An affirmative defense essentially admits the defendant's commission of the elements of the charged act but seeks to justify, excuse, or mitigate the commission of the act." *Roberts v. People*, 2017 CO 76, ¶ 20, 399 P.3d 702, 705; *see People v. Pickering*, 276 P.3d 553, 555 (Colo. 2011) (noting that affirmative defenses admit "the defendant's commission of the elements of the charged act, but seek to justify, excuse, or mitigate the commission of the act").

¶ 42    The elements of first and second degree murder, coupled with the facts surrounding Nichols's death, demonstrate why a nondeadly force jury instruction was not warranted in this case.

¶ 43    A person commits first degree murder "[a]fter deliberation and with the intent to cause the death of a person," § 18-3-102(1)(a), C.R.S. 2025, and a person commits second degree murder by

"knowingly caus[ing] the death of a person," § 18-3-103(1)(a), C.R.S. 2025. A person acts knowingly, "with respect to a result of h[er] conduct, when [s]he is aware that h[er] conduct is practically certain to cause the result." § 18-1-501(6), C.R.S. 2025. And "if one has acted 'with intent,' one has necessarily acted 'knowingly.'" *People v. Snider*, 2021 COA 19, ¶ 63, 491 P.3d 423, 436.

¶ 44    "Deadly physical force" means "force, the intended, natural, and probable consequence of which is to produce death, and which does, in fact, produce death." § 18-1-901(3)(d), C.R.S. 2025. Whether physical force qualifies as "deadly" turns on the nature of the force itself, and not the actor's subjective intent. *Opana*, ¶¶ 16-17, 395 P.3d at 761-62.

¶ 45    "[I]f the record contains any evidence to support [a defendant's] theory" of the case, then the trial court must give "an instruction embodying" that theory. *People v. Garcia*, 28 P.3d 340, 347 (Colo. 2001). "[W]hether there is credible evidence to support each element of an affirmative defense is a question for the court rather than the jury." *People v. Speer*, 255 P.3d 1115, 1119 (Colo. 2011). In addition, when "credible evidence permits no other finding than that the physical force used by the defendant would

normally be expected to, and in fact did, produce death," the assessment of "whether or not physical force arguably used in self-defense constituted 'deadly physical force'" is not a question for the jury. *Opana*, ¶ 16, 395 P.3d at 762.

¶ 46 We reject Kalan's argument that she was entitled to a nondeadly force instruction for three reasons.

¶ 47 First, to be convicted of murder, Kalan had to engage in conduct with an awareness that her conduct was practically certain to, and did, cause Nichols's death. *See* §§ 18-3-102(1)(a), 18-3-103(1)(a). Force that is "practically certain," § 18-1-501(6), to cause death satisfies — if not surpasses — the standard for "deadly physical force," meaning force that is "normally . . . expected" to cause death, *Opana*, ¶ 16, 395 P.3d at 762. Kalan's self-defense argument could not rely on nondeadly force because any affirmative defense to murder requires an admission that the defendant committed the elements of murder — including that she used force normally expected to cause death. *See Roberts*, ¶ 20, 399 P.3d at 705. Thus, in a murder prosecution, the force supporting self-defense is necessarily deadly force; a defendant cannot seek acquittal for murder based on using only nondeadly force. Such an

argument cannot be squared with the concept of an affirmative

defense. *See id.*

¶ 48    Accordingly, by asserting self-defense as an affirmative defense

to murder, Kalan effectively admitted that she used deadly force

against Nichols. For this reason, Kalan was not entitled to a

nondeadly force self-defense instruction.

¶ 49    Second, Kalan was not entitled to a nondeadly force

self-defense instruction because shooting Nichols in the leg, near

the groin, at close range — resulting in fatal blood loss —

constituted "force, the intended, natural, and *probable consequence*

of which [was] to produce death, and which d[id], in fact, produce

death." § 18-1-901(3)(d) (emphasis added).

¶ 50    Third, even assuming that Kalan was entitled to a nondeadly

force self-defense instruction, the court still allowed the jury to

consider Kalan's possible use of nondeadly force by giving Kalan's

tendered general self-defense instruction.

¶ 51    In sum, we hold that the general self-defense instruction the

court provided did not reduce the prosecution's burden of proof.

## C. The Trial Court Correctly Found No Prosecutorial Misconduct

### 1. Standard of Review

¶ 52 "In a claim of prosecutorial misconduct, the reviewing court engages in a two-step analysis." *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010). "First, it must determine whether the prosecutor's questionable conduct was improper based on the totality of the circumstances and, second, whether such actions warrant reversal according to the proper standard of review." *Id.*

### 2. The Prosecutor's Rebuttal Closing

¶ 53 Kalan contends that the prosecutor committed misconduct in his rebuttal closing argument by (1) "argu[ing] matters outside the record and inject[ing] his credibility into the case" and (2) "misstat[ing] the law." We disagree.

¶ 54 "[P]rosecutors have wide latitude in the language and style they choose to employ, as well as in replying to an argument by opposing counsel." *People v. Samson*, 2012 COA 167, ¶ 30, 302 P.3d 311, 317. "In addition, because arguments delivered in the heat of trial are not always perfectly scripted, reviewing courts accord prosecutors the benefit of the doubt when their remarks are ambiguous or simply inartful." *Id.*

¶ 55    "In closing argument, counsel may employ rhetorical devices and engage in oratorical embellishment and metaphorical nuance," provided that counsel "does not thereby induce the jury to determine guilt on the basis of passion or prejudice, attempt to inject irrelevant issues into the case, or accomplish some other improper purpose." *People v. Allee*, 77 P.3d 831, 837 (Colo. App. 2003).

### a.    Arguing Matters Outside the Record

#### i.    Additional Facts

¶ 56    In addressing the aggravated motor vehicle theft charge during closing argument, defense counsel disputed the prosecution's assertion that Kalan took Nichols's truck without authorization. Defense counsel asserted that Kalan "ha[d] been using this truck basically freely as much as she want[ed]."

¶ 57    In his rebuttal, the prosecutor addressed Kalan's conduct after the shooting — specifically, her decision to leave the scene in Nichols's truck rather than seek help from neighbors. To support his argument that, even if Kalan once had permission to use the truck, she no longer had authorization after killing him, the prosecutor said: "Now, I had a friend in college, let him borrow my

27

car a lot. It wasn't a problem. We were friends. We had a big argument one day."

¶ 58    Defense counsel objected, arguing, "Your Honor, this gets into his testifying as to his own personal experience, puts his credibility on the line. That's improper." The court overruled the objection, saying, "Well, I haven't heard anything improper yet, so overruled." The prosecutor continued:

> After the argument, he wasn't allowed to use my car. I didn't have to tell him that. It was common sense. *When you murder a man, he's probably not going to consent to you driving off in his truck. That's common sense.* That's what we're asking you to take back into the deliberation room.

(Emphasis added.)

### ii.    The Prosecutor's Argument Was Permissible

¶ 59    Kalan contends that "[t]he prosecutor's anecdote concerned matters outside the record and beyond the jury's experiences and observations in life" and, therefore, was not a "proper consideration[] for the jurors in rendering a verdict." She further asserts that "the prosecutor improperly used his story to suggest a standard for assessing mental state, thereby injecting his own

credibility and knowledge into the case." This argument lacks merit.

¶ 60     "[P]rosecutorial remarks that evidence personal opinion [or] personal knowledge . . . are improper. Factors to consider when determining the propriety of statements include the language used, the context in which the statements were made, and the strength of the evidence supporting the conviction." *Domingo-Gomez v. People*, 125 P.3d 1043, 1050 (Colo. 2005). "The context in which challenged prosecutorial remarks are made is significant, including the nature of the alleged offenses and the asserted defenses, the issues to be determined, the evidence in the case, and the point in the proceedings at which the remarks were made." *Id.* (quoting *Harris v. People*, 888 P.2d 259, 266 (Colo. 1995)).

¶ 61     Although the prosecutor employed a personal anecdote, it served only to illustrate that the jury should use its "common sense" in deciding whether Kalan was still authorized to use the truck after the shooting. The anecdote did not suggest that the prosecutor had information outside the evidence presented to the jury. For these reasons, the prosecutor's argument properly rested on a logical inference. *See id.*

29

### b. Misstating the Law

### i. Additional Facts

¶ 62 During rebuttal closing argument, the prosecutor offered the following remarks about self-defense:

> Self-defense requires that [Kalan] use[d] reasonable force in response to a reasonable threat, and because she used deadly force, it had to have been a risk of serious bodily injury or death to her or someone else by [Nichols].
>
> What evidence do you have of that?  None. The closest you got to that this whole week was [Ahee] sat up there on Monday and said, then they started fighting.  But what did [Ahee] say [seventeen] months ago when she was still affected by what she had just observed [Kalan] do?  You will get those videos from her interview with [the police], and I want you to look at them and see how emotional and affected she still is.  And what does she say?
>
> We were laying [sic] in bed trying to sleep, and [Nichols] said, Shut the fuck up, [Kalan].
>
> You tell me to shut the fuck up?  I'll shut you the fuck up.
>
> *She was the instigator.  You don't get to claim self-defense if you start the fight, and you definitely don't get to exercise self-defense if you are the one who drew the gun in the first place.*

(Emphasis added.)

30

¶ 63     Defense counsel objected, "That misstates the law, Your

Honor.  You can, in fact, do that."  In response, the court addressed

the jury, "Ladies and gentlemen, I'll instruct you to rely on the jury

instructions that you will receive and that I read to you in terms of

what the law is."

¶ 64     The prosecutor then continued:

> What threat did that man pose to her that
> night?  What danger was she in?  What danger
> was so severe that, after hitting him with a pot
> seven to nine times, she went and got her gun,
> cocks it, and points at him?  What danger is
> he posing at that point when she puts the gun
> back down?  What danger is he posing when
> she picks the pot back up and hits him again?
> What danger is he posing when she picks her
> gun back up one final time?  What danger is
> posed?  There is no danger, so she doesn't get
> to claim self-defense.

### ii.     The Prosecutor's Comments Did Not Rise to the Level of Misconduct Based on the Totality of the Circumstances

¶ 65     Relying on the prosecutor's emphasized comments above and

the statutory phrase "imminent use of unlawful physical force,"

§ 18-1-704(1), C.R.S. 2025, Kalan contends that the "comments

misstated the law."  She asserts that they "suggest one has to let

31

the other person cause physical harm before they can act in self-defense." We are not persuaded.

¶ 66 Considering the totality of the circumstances, the challenged comments were not improper. *See Wend*, 235 P.3d at 1096. Before making those comments, the prosecutor accurately described the governing principles of self-defense, including that a person may use force in response to an imminent threat of unlawful force. The prosecutor's statement, made after the court referenced the jury instructions, makes clear he was properly arguing that Kalan could not rely on a self-defense theory under the circumstances because Nichols posed no threat to her, let alone an imminent one.

¶ 67 In sum, the prosecutor did not commit misconduct.

D. The Doctrine of Cumulative Error Does Not Apply

¶ 68 "[N]umerous formal irregularities, each of which in itself might be deemed harmless, may in the aggregate show the absence of a fair trial, in which event a reversal would be required." *Howard-Walker v. People*, 2019 CO 69, ¶ 24, 443 P.3d 1007, 1011 (quoting *Oaks v. People*, 371 P.2d 443, 446 (Colo. 1962)). To obtain relief, a defendant must demonstrate that "the cumulative effect of [multiple] errors and defects substantially affected the fairness of

32

the trial proceedings and the integrity of the fact-finding process."

*Id.* (quoting *People v. Lucero*, 615 P.2d 660, 666 (Colo. 1980)).

¶ 69    But "[c]umulative error applies only if the trial court committed numerous errors; defendant's mere assertions of error are insufficient to warrant reversal." *People v. Blackwell*, 251 P.3d 468, 477 (Colo. App. 2010).

¶ 70    As explained above, we reject Kalan's arguments that the trial court erred. Accordingly, the doctrine of cumulative error does not apply.

### III.    Disposition

¶ 71    The judgment is affirmed.

JUDGE YUN and JUDGE SCHUTZ concur.